In the Matter of **INSULATION &**
**ACOUSTICAL SPECIALTIES,**
**INC., Bankrupt.**

No. 32569.

United States District Court,
W. D. Missouri, W. D.

July 24, 1969.

Larry McMullen, Caldwell, Blackwell,
Sanders & Matheny, Kansas City, Mo.,
for bankrupt.

## MEMORANDUM AND ORDER

JOHN W. OLIVER, District Judge.

### I.

This case pends on a petition for review of the Referee's order of April 22, 1968, filed by assignees Bennett, Tomlinson, Smith, Willey, and Swanson. The parties agree that this case should be considered on the evidence adduced before the Referee.

The Referee filed findings of fact, conclusions of law, and entered its order of April 22, 1968, which set aside an earlier order entered October 7, 1966. That earlier order, entered without notice to creditors, authorized the sale and transfer to petitioners of Sun Life Assurance Company of Canada Policy No. 5133449, insuring the life of James B. Anchors, President of the bankrupt. It

is undisputed that the insurance policy was an asset of the bankruptcy estate.

The Referee made the following findings of fact:

### Findings of Fact

1. Woodrow W. Bennett, Wilbur M. Tomlinson, Henry H. Smith, Geneva Willey and Hubert L. Swanson (hereafter called "Assignees") were stockholders and directors of the bankrupt (Answer and Motion of Petitioners, Par. 1), and at the organization of the bankrupt company on September 1, 1960 (Creditor's Ex. A), they each put $5,000.00 into the company and received stock in exchange (Tr. 154, 155).

2. In October, 1960 (Tr. 177) the bankrupt company approved purchase from the Sun Life Assurance Company of Canada of convertible five year term life insurance policy number 5133449, insuring the life of James B. Anchors, President and Managing Officer of the bankrupt in the face amount of $50,000.00 (Answer and Motion of Petitioners, Par. 1). The bankrupt company purchased the policy, was the owner thereof (Tr. 122), paid all of the premiums due (11, 13, 124) and was the beneficiary, all until after bankruptcy was commenced on April 7, 1966.

3. On December 3, 1963, the policy was converted to an ordinary life policy containing additional features, including a non-forfeiture provision (Tr. 123). This provision means that when premiums are in default, the cash value of the policy will automatically be used to continue the policy in the full face amount as term insurance until the cash value is exhausted (Tr. 123).

4. The last regular quarterly premium on this policy was paid by the bankrupt company when due in March, 1966; no further premium was due until June, 1966. In September, 1966, the cash value of the policy was determined to be $1,723.60, and was sufficient to continue the policy under the non-forfeiture provision as term insurance without additional premiums in the full face amount, until October 1, 1968 (Tr. 126).

5. In May, 1965, James Anchors underwent surgery for removal of a cancerous obstruction from his colon. It was then found that the cancer had spread to such an extent that his physician, Dr. Don Black, knew it could not be entirely removed (Tr. 30). Seven to ten days following surgery, James Anchors received cobalt therapy, and thereafter he received intravenous injections of Uracil Mustard (Tr. 33). Following the surgery, it was Dr. Black's opinion that the outlook for Mr. Anchors was "very poor" (Tr. 43), and he thought that Mr. Anchors would not live "over about a year and a half to two years" (Tr. 49).

6. In June, 1965, Mrs. Lucille La-Vine, then bookkeeper for the bankrupt, knew that James Anchors was ill when he told her he was going into the hospital for a check (Tr. 13).

Shortly after that in June, 1965, Assignees Hubert Swanson, Henry Smith and W. W. Bennett came to the office of the company, and requested Mrs. LaVine to call Mr. Anchors' doctor to ask how Mr. Anchors was. Dr. Don A. Black informed Mrs. LaVine and she informed the three said assignees that Mr. Anchors was ill and "they had located a spot" (Tr. 15). In this conversation, Dr. Black told Mrs. LaVine that the outlook on Mr. Anchors' life was "problematical" and that "many times treatments are very, very effective—it all depends" (Tr. 17). She passed this information on to the said assignees (Tr. 17). Said assignees asked Mrs. LaVine to keep them informed and about one week later, she again called Dr. Black and then called Mr. Hubert Swanson, and told him what Dr. Black said (Tr. 23).

7. In January, 1966, Dr. Black treated Mr. Anchors at the hospital for pneumonia, and for "an overdose of sleeping pills" (Tr. 52). Mr. Anchors then told Dr. Black that he (Anchors) knew he had taken an overdose of sleeping pills (Tr. 52) and he (Anchors) gave Dr. Black "the devil for treating him and bringing him out of it" (Tr. 53). During this hospitalization in January,

1966, Dr. Black told Mr. Hubert Swanson, at the hospital, that Mr. Anchors "was not in good shape" (Tr. 59).

8. During the week of January 17, 1966, the accountant for the bankrupt company advised Larry L. McMullen, attorney for the company, that the company was hopelessly insolvent and, in the accountant's opinion, bankruptcy was indicated (Tr. 67). On January 25, 1966, assignees Hubert Swanson, W. W. Bennett and Henry Smith met with Mr. McMullen in his office to discuss the company's situation (Tr. 68). There was another meeting of the same persons a day or two later (Tr. 69). At these meetings, it was discussed that Mr. Anchors had cancer (Tr. 70). As a result of the meetings, Mrs. LaVine was advised to be certain to pay the premiums on the life insurance policy (Tr. 68), and she did thereafter pay the premiums from the company funds right up to the time of bankruptcy (Tr. 11, 13, 20).

9. Prior to filing of bankruptcy on April 7, 1967, it was rumored that James Anchors had cancer and that it was a terminal case (Tr. 115). The credit manager for creditor Gustin-Bacon knew before January, 1966, that Mr. Anchors had cancer (Tr. 101).

Assignee W. W. Bennett testified that probably someone had mentioned to him that Mr. Anchors had cancer (Tr. 182). Assignee Hubert Swanson testified that he agreed with all of Mr. Bennett's testimony (Tr. 216), and that Dr. Black had told him (Swanson) in January, 1966, that Mr. Anchors was seriously ill (Tr. 211, 215). No other assignees testified.

10. After George Aylward's appointment as Receiver on April 20 or 21, 1966, and before the first meeting of creditors in May, 1966, Mr. McMullen informed Mr. Aylward that Mr. Anchors had cancer (Tr. 186). On June 4, 1966, at the time of a meeting in the office of Mr. Roy Swanson, attended by Mr. Roy Swanson, Mr. Jack Kitchen, Mr. James Anchors and Mr. Larry McMullen, Mr. Kitchen, one of the attorneys for assignees, was aware that James Anchors had cancer (Tr. 35).

At the first meeting of creditors, the record shows that Mr. Anchors did mention that he had cancer and was being treated by an experimental drug. The Court, however, states that at the time the application to sell this policy was presented, the Court had no independent recollection of this testimony and was not aware of the state of his health. Mr. Anchors died April 10, 1967.

11. Immediately following the first meeting of creditors in May, 1966, in a conversation between Mr. Aylward and Mr. McMullen, it was decided by Mr. Aylward to leave the insurance policy in effect during the six-month period that he expected the bankruptcy estate to remain open for the protection of the creditors, so that if Mr. Anchors should die during the bankruptcy, the insurance proceeds would come into the estate (Tr. 121, 197, 201).

12. Mr. Aylward was waiting to close the estate before surrendering the life insurance policy for its cash value when Mr. Roy Swanson came to Mr. Aylward's office (Tr. 195). Mr. Aylward then prepared and presented to the Court on October 7, 1966, an Application and prepared Order authorizing Trustee Aylward to transfer the policy to the assignees in exchange for the cash surrender value of $1,723.60.

13. In considering the advisability of authorizing the transfer of the policy, the Court was unaware that Mr. Anchors was then suffering' from cancer; because of the representations contained in the Application and furnished Order, the Court was erroneously led to believe that the policy was in imminent danger of lapsing because of premium default, when, in fact, and unknown to the Court, the policy would continue in force for the full face amount until October 1, 1968, without payment of any additional premiums; the Court was further unaware of any possibility that the policy might have a value in excess of the cash value of $1,723.60 when, in fact, at least one creditor was interested in purchasing the policy (Tr. 112); and for these

reasons, the Court was erroneously led to believe that it was "fully advised"; that "good cause" existed for the execution of the Order; and that the "full value" of the policy would be received by its transfer, all as erroneously recited in the Application and Order submitted to the Court as aforesaid.

14. Notice of the Application for Order Authorizing Transfer of Insurance Policy was not served upon the creditors at any time. (Court File) (Tr. 207). The Application and form of Order submitted to the Court made no representation or finding of cause to dispense with notice to the creditors.

15. Between February 9, 1966 and March 9, 1966, Mr. James Anchors suggested to Mr. Larry McMullen that it had been suggested that the policy of life insurance should be transferred to the ownership of the assignees. Mr. Anchors requested Mr. McMullen's advice concerning the legality of such a transfer and by letter of March 9, 1966 from McMullen to Anchors (Creditor's Exhibit E), it was stated that such a transfer might be held to be a fraud on creditors (Tr. 75, 76). Assignees' witness, John J. Kitchen, testified that even after bankruptcy, Anchors had a "strong desire to see if this policy could be obtained, sir, from the trustee" (Tr. 232) "for the fellows who had helped him in the start of the business" (Tr. 232, 233).

16. The bankruptcy schedules filed with the Court in April, 1966 identify and list the life insurance policy as an asset of the bankrupt company (Court file) and the policy thereafter became an asset of the bankruptcy estate for the benefit of the creditors.

17. Prior to September 8, 1966, Roy Swanson, one of the attorneys for assignees, requested transfer and reinstatement of the policy from Mr. Oliver McKillop of Sun Life Assurance Company (Tr. 128). The assignees paid the cash value of $1,723.60 for the policy (Tr. 134). They also paid back premiums in the amount of $1,311.05 (Assignee's Exhibit 2) in order to have the policy reinstated (Tr. 127, 135). The

policy was reinstated for the assignees as owners on October 21, 1966 (Tr. 129).

On January 4, 1967, Mr. Roy Swanson submitted an application for waiver of disability benefit under the policy (Tr. 134). It was determined by Sun Life Assurance Company, pursuant to that application, that Mr. Anchors had been disabled since March, 1965 (Tr. 132), and, therefore, no premiums had in fact been due on the policy since December, 1965 (Tr. 132, 133). Accordingly, premiums paid since December, 1965 in the amount of $3,248.70, were reimbursed to the assignees on January 25, 1967 (Tr. 132).

18. The Sun Life Assurance Company would have reinstated the policy for anyone who paid the premiums due at that time, including any of the creditors in this estate (Tr. 136).

19. In September, 1966 when Mr. McKillop first discussed the transfer of the policy with Mr. Roy Swanson, the term insurance feature that would carry the policy on in the event of premium default was discussed (Tr. 150).

20. An unsecured claim has been filed by the movant creditor Gustin-Bacon Manufacturing Company in the amount of $56,818.58. Other unsecured claims have been filed in the total amount of $94,809.07. Assets in the estate other than the life insurance policy (excluding accounts receivable of doubtful value) total $9,236.68.

The Referee concluded as a matter of law (1) that he had jurisdiction to set aside what he determined to be an erroneous order; (2) that the life insurance policy should have been treated as any other asset of the estate; (3) that the Referee's original order of October 7, 1966, was made in violation of Section 58(a) (4) of the Bankruptcy Act, 11 U.S.C.A. § 94(a) (4); and (4) that the notice to creditors requirement of that section had not been complied with. The Referee then concluded and ordered that:

*Conclusions of Law*

■ 1. The Court has jurisdiction to set aside the Order authorizing trans-

fer of the insurance policy at any time, if convinced the Order was erroneous. U. S. Machinery Movers v. Beller, 280 F. 2d 91 (8th Cir. 1960); Procter & Gamble Manufacturing Company v. Metcalf, 173 F.2d 207 (9th Cir. 1949); In the Matter of Harrison-Pringle Co., 223 F.Supp. 332 (D.C.Mich.1963).

2. The life insurance policy was property of the bankruptcy estate to be conserved and managed for the best interest of the estate. Collier Bankruptcy Manual, Section 47. The true value of the policy, like other property was what it would bring at a public sale after notice. The policy could have been sold to the highest bidder and any creditor would have had an insurable interest. Lincoln National Life Ins. Co. v. Scales, 62 F.2d 582 (5th Cir. 1933). A bidder without an insurable interest could have purchased the policy. Alexander v. Griffith Brokerage Co., 228 Mo.App. 773, 73 S.W.2d 418 (1934).

3. The sale of the life insurance policy was erroneously authorized by the Order of October 7, 1966, in that ten days' notice of the proposed sale was not given to the creditors of this estate, and the representations of cause for dispensing with notice, made to the Court in support of said Order, were erroneous or insufficient, all in violation of Section 58a (4), 11 U.S.C.A., Section 94(a) (4).

4. The Order of October 7, 1966 fails to expressly dispense with the requirement of notice to the creditors of the proposed sale, as required by Section 58a (4), 11 U.S.C.A., Section 94(a) (4). In re Lake Champlain Pulp & Paper Corp., 20 F.2d 425 (D.C.N.Y.1927).

5. Under the circumstances of the insured's illness and the non-forfeiture provisions of said policy, both unknown to the Court at the time of entry of said Order, it was not in the best interests of this estate to authorize transfer of said policy to the assignees in exchange for the then cash value of $1,723.60.

6. Under the circumstances of the insured's illness and the non-forfeiture provisions of said policy, both unknown to the Court at the time of entry of said Order, the amount of $1,723.60 received by the estate in exchange for transfer of the $50,000.00 policy to assignees was grossly inadequate. Slocum v. Edwards, 163 F.2d 627 (2nd Cir. 1948); Procter & Gamble Mfg. Co. v. Metcalf, 173 F.2d 207 (9th Cir. 1949); In re Park Distributors, Inc., 176 F.Supp. 38 (D.C.Cal. 1959).

Based upon the foregoing findings of fact and conclusions of law, it is hereby further expressly found, and Ordered, Adjudged and Decreed, that said Order of October 7, 1966, and the sale and transfer authorized therein should be and they hereby are set aside and held for naught and said sale is not and shall not be confirmed.

The Trustee is hereby further ordered to recover from said assignees said policy of life insurance and the assignees and each of them, are hereby ordered to return same to the Trustee and to execute any and all documents which may be necessary to effectuate the same and further, said assignees are ordered to pay to the trustee the total sum of $214.05, representing the excess received by said assignees over and above the total amount paid by them for the cash value and premiums on said policy, and further, said Trustee is hereby ordered to do each and every necessary thing to carry out the terms of this Order. The Court specifically rules all matters relating to attorneys' fees of whatever kind or nature are not properly before the Court at this time. A ruling on attorneys' fees will be made upon a proper application and hearing.

On December 31, 1968, the Referee denied petitioner's Motion for Reconsideration of the Order of April 22, 1968.

II.

In In re Woody (W.D.Mo.1966), 248 F.Supp. 855, we determined that the standard to be applied by the district court in reviewing findings of fact of the Referee is the "clearly erroneous" standard stated in Rule 52(a) of the Federal Rules of Civil Procedure, and in General Order No. 47. We also stated

in *Woody* that "a District Court is required by General Order in Bankruptcy No. 47 to accept all factual inferences that a Referee may make in a particular case from stipulated or undisputed basic facts unless such inferences are found to be 'clearly erroneous.' " *Id.* at 858.

▮ Our examination of the evidence in light of that standard convinces us that the Referee's findings of fact are supported by substantial evidence and that no court could properly determine that the findings made by the Referee in this case are "clearly erroneous" within the meaning of Rule 52(a) and General Order in Bankruptcy No. 47.

The conclusions of law stated by the Referee properly state the controlling principles of law and make appropriate application of those principles to the facts as he found them. We therefore adopt the conclusions of law made by the Referee. His order of April 22, 1968 will therefore be affirmed.

### III.

It is appropriate, however, to add a word in light of the Trustee's testimony and an argument presented by the petitioners for review. It is contended that the Trustee in this case merely followed some sort of prior practice in the bankruptcy court when he obtained the original order of sale without notice and that the Referee therefore should not set aside an order obtained in accordance with that prior practice. The Trustee testified that he had acted in accordance with "the policy in other estates" (p. 13, May 20, 1968 transcript). The Assignee's brief in this Court (page 11) contends that it is "important" that the Trustee "did nothing different * * * in handling the sale of this particular insurance policy * * * than had been the prior practice in the bankruptcy court."

▮ The fact, if it is a fact, that this and other trustees may have been permitted to administer estates in bankruptcy in a manner inconsistent with the express provisions of the Act and General Orders is irrelevant to the question of whether the Referee's original order of sale entered in this case should have been permitted to stand. This case vividly illustrates the reasons why the Act and General Orders imposing particular duties on trustees in bankruptcy and others must be complied with and followed in all cases. It is most probable that had that been done, this case would never have reached this Court.

The mandatory provisions of the Act and General Orders are so plain that we need only make reference to appropriate portions of Collier on Bankruptcy. Paragraph 70.96[1], page 1120, states:

> One of the first duties of a trustee upon his appointment and qualification is to "prepare a complete inventory of all the property of the bankrupt or debtor that comes into his possession." In complying with this duty he is aided by the appraisal which the Act seems to require in every case where the bankrupt has any property, irrespective of the type and of the value of the assets in question. The first sentence of § 70f reads:

> > The court shall appoint a competent and disinterested appraiser and upon cause shown may appoint additional appraisers, who shall appraise all the items of real and personal property belonging to the bankrupt estate and who shall prepare and file with the court their report thereof. [Collier on Bankruptcy, 14th ed. Vol. 4A, p. 1120]

For reasons unknown and unexplained, the insurance policy in question was not appraised by a competent and disinterested appraiser or by anyone else in spite of the fact the bankruptcy files show that an appraiser's fee was awarded. All persons concerned with the administration of the bankruptcy estate, save only the Referee, had knowledge from the outset of the administration that the bankrupt's president had cancer. Minimal investigation would have prompted appropriate inquiry of Dr. Don Black who operated on Mr. Anchors in May, 1965, almost two years before bankruptcy was filed. It is obvious that

Dr. Black would have promptly advised, as he later did, that Mr. Anchors would likely live no longer than about a year and a half or two years after the operation. But no one asked him. The impact of that information is apparent from the Trustee's candid testimony that if he had ever "had any reason to believe that he [Mr. Anchors] would die at an early date * * * I would have never presented the application to sell this policy or to cash it in" (p. 14 of May 20, 1968 transcript).

Section 70, sub. f of the Act mandatorily requires that *all* the items of * * * personal property," not just some of those items, shall be appraised. In re Layton (D.Ariz.1963), 211 F.Supp. 667, establishes that Section 70f means exactly what it says. In re Prather Elec. Co. (S.D.Ill.1956), 138 F.2d 433, holds that a failure of compliance with that duty which results in a loss to a creditor renders the trustee of the bankruptcy estate personally liable.

Paragraph 70.96[2], page 1121 of Collier states:

> To aid and at the same time to control the trustee are two of the important functions of an appraisal. There are others. Creditors are desirous to know at the earliest possible date what their expectations are. Reliable information on the value of all available assets is one of the essential factors determining the degree of their interest in the proceedings and in any proposed steps toward recovery of further assets. Moreover the appraisal establishes at least a yardstick to measure the adequacy or inadequacy of bids and sales prices. * * * Above all, appraisal constitutes a definite limit upon the authority of the trustee to dispose of assets, as the Act itself makes approval of the court a condition precedent to any sale for less than 75 per centum of the appraised value.

Section 70, sub. f of the Act, of course, requires that "real and personal property shall, when practicable, be sold subject to the approval of the court." In paragraph 70.97[1], page 1128, Collier states "the provisions of § 70f, § 58a(4) (providing for notice to creditors of all proposed sales), General Order 18 and the Official Forms prescribed in connection with the sale of real estate serve to establish rules as to how this power of the bankruptcy court should be exercised or invoked." And in paragraph 70.97[1], page 1151, Collier states:

> General Order 18 provides (1) for a court order where property is to be sold otherwise than by public auction; (2) for a special authorization, upon good cause shown, to sell at private sale. Likewise, § 58a(4) provides for a court order where the statutory time for advising creditors of the sale is to be shortened or completely disregarded. * * * The provision in § 58a (4) for notice to creditors of a *proposed* sale likewise indicates that the Act itself contemplates, if it does not expressly require, a judicial determination of any objections to be raised, which determination most logically would be left to the order, or denial of an order, to sell. [emphasis Collier's].

Paragraph 70.98[2], page 1154, stated that "a word of warning should be added" in connection with Section 58a(4), namely, "the fact that § 58a(4) dispenses with notice to creditors if the court 'upon cause shown' so orders means exactly what it says 'cause' must be 'shown' therefor." See also In re Park Distributors (S.D.Cal.1959), 176 F.Supp. 38, and In re General Insecticide Co. (2nd Cir. 1968), 403 F.2d 629.

Paragraph 70.98[5], page 1157 of Collier, appropriately states that General Order 18 commands that "public auction is the rule" and that only for "good cause shown" may a referee properly authorize a trustee or receiver to sell "either all the property or part of it at a private sale." Paragraph 70.98[10], page 1164, suggests that the referee should, on occasion, impose additional conditions to protect the estate. It states:

> The regular practice of selling subject to the approval of the court pro-

tects the estate against the danger that assets will be disposed of at grossly inadequate prices. In some cases, however, it may be advisable to superimpose an additional safeguard by limiting in advance the trustee's authority to sell below a certain minimum price, a so-called "upset price." The advantages of such a practice are obvious. It neutralizes to some extent the effect of collusive bidding.

The Trustee's failure to ascertain the actual value of the insurance policy undoubtedly would have been rectified had the notice required by law been given the creditors who later protested the proposed private sale after they learned of what happened. That is the reason why the law requires that notice be given in all matters that affect the interest of creditors in a bankruptcy estate.

We are confident that the Referees of this Court will direct the attention of all trustees and receivers to this opinion and to the sections of the Act and General Orders to which we have made reference in order that problems like the one presented in this case will be avoided in future cases.

A copy of this opinion has been circulated among all active judges of this Court. Chief Judge Becker and Judges Collinson and Hunter have authorized me to state their agreement with the legal principles and policy stated in Part III of this opinion. The affirmance of the Referee, for the reasons stated in Parts I and II, of course, is the sole responsibility of the judge of this division.

For the reasons stated, it is

Ordered that the Referee's findings of fact, having been determined to be not clearly erroneous, should be and are hereby adopted as the findings of this Court. We have noted our concurrence with and therefore approve the Referee's conclusions of law. It is therefore

Ordered that the pending petition for review should be and is hereby denied. The Referee's Order of April 22, 1968 is therefore affirmed.