**In re F.A. POTTS & CO., INC., Debtor.**

**Bankruptcy No. 81–03639 T.**

United States Bankruptcy Court,
E.D. Pennsylvania.

June 1, 1988.

---

Earl T. Stamm, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for debtor.

Gary Schildhorn, Adelman Lavine, Gold & Levin, Philadelphia, Pa., for Committee.

Iles Cooper, Williamson, Friedberg & Jones, Pottsville, Pa., for ENESCO.

James J. Riley, Pottsville, Pa., for APC.

## MEMORANDUM OPINION

THOMAS M. TWARDOWSKI, Bankruptcy Judge.

Three matters, originating from the coal fields of Schuylkill County, are presently before this court:

1. The Motion[1] of APC–Alternative Power Corporation ("APC") to vacate this court's August 20, 1986 order, which authorized the sale of property belonging to F.A. Potts & Co., Inc., et al.[2] ("debtor") to ENESCO—The Energy Systems Co., Inc. ("ENESCO");[3]

2. The Motion of Pagnotti Enterprises, Inc. ("Pagnotti") to compel implementation of an August 20, 1986 agreement between debtor and Pagnotti to sell to Pagnotti certain anthracite culm and an ash disposal site;

3. The Countermotion of debtor requesting that we partially[4] vacate our August 20, 1986 order.

For the reasons set forth herein, we will deny the motion to compel implementation and grant the motion to vacate, which will

---

1. We refer jointly to an original motion and a January 22, 1987 amended motion, in support of which the debtor and Creditors Committee have filed briefs.

2. This is a consolidated case captioned and docketed as noted above. The August 20, 1986 order refers to G.M.P. Land Co., Inc., one of the debtors in this consolidated proceeding. For ease of reference, we use the term "debtor" to identify the entity authorized to act.

3. As developed in this memorandum, ENESCO claims that two separate, severable agreements existed: one between debtor and ENESCO, and one between debtor and Pagnotti Enterprises, Inc. The parties refer to Pagnotti variously as ENESCO's "nominee" or "assignee," but we have no evidence in front of us indicating the exact nature of or legal basis for this relationship.

4. Of course, debtor requests that we vacate the August 20th order *partially* so that it can reap the benefits of the liquidated damages clause allegedly effective now that ENESCO has defaulted on the land portion of the August 20th agreement. This motion was not heard with the other two motions. *See* discussion, *infra* at p. 863. Our decision on the other motions, however, effectively moots this countermotion.

serve to deny the countermotion for partial vacation.

## I FACTUAL AND PROCEDURAL BACKGROUND

This is the story of two entities enmeshed in the complex regulatory world governing the development of fluidized bed cogeneration facilities and their own plans to build such a facility in the same area: on the debtor's property. Although we are not required to present findings of fact and conclusions of law, we recognize the tortuous factual and procedural nuances of this case, as well as the avid interest of counsel, and have determined that this narrative is the most reasonable method of presenting our opinion.

Over eight hundred docket entries ago, on September 11, 1981, debtor filed a voluntary chapter 11 proceeding. Formation of an active Creditors' Committee culminated when we confirmed the Fourth Amended Plan of Reorganization ("Plan") filed by that Committee. Essentially, this Plan liquidates debtor's assets and distributes the proceeds to the creditors. Those assets include a one hundred (100) acre parcel of property ("parcel I"), a second parcel of property on which the culm is located ("parcel II"), and an undetermined amount of culm.

On March 11, 1986, the Committee filed a motion seeking approval of the sale of parcel I to ENESCO for the sum of $100,000. Debtor filed an objection based on an offer it had received from APC to purchase the land plus 1.2 million dollars worth of culm material. Notes of Testimony ("N.T."), May 6, 1986, p. 7. At the May 6, 1986 hearing, we allowed APC and ENESCO to bid on the land only, since the notice to creditors indicated only that parcel I would be sold. N.T., May 6, 1986, p. 9. APC was the successful bidder with a high bid of $410,000. N.T., May 6, 1986, p. 40. Our order approving this sale was entered on May 20, 1986.

Claiming that APC had failed to close within the required thirty (30) day period, ENESCO filed a motion on June 8, 1986, requesting that we vacate our May 20th order. The Committee opposed this motion to vacate the sale of parcel I, and also filed and noticed its own motion requesting that parcel II be sold to ENESCO. At the consolidated June 24, 1986 hearing, we heard counsel's arguments.[5] Interpreting the clauses regarding the closing deadline, we issued a bench order ruling in favor of ENESCO and vacating the May 20th order.[6] The Committee then joined in the debtor's objection to the sale to ENESCO, N.T., May 6, 1986, p. 34, citing the fact that it would prefer the opportunity to raise "... a much greater, a much more significant sum of money through the culm purchase and sale to APC." N.T., May 6, 1986, p. 35. The parties were told that it was our intention, through our order vacating the May 20th order and our decision not to rule on the offer to sell parcel II, to bring the parties back to "square one," and to allow presentation of a "new and complete record" with notice and opportunity to have all creditors heard. N.T., May 6, 1986, p. 35.

The committee responded on June 22, 1986, with a motion to sell a tract of property, plus a second tract upon which culm was located, the culm and an ash disposal site (and to grant easements) to ENESCO. (To facilitate future reference, this will be referred to as the sale of "the land and the culm.") Notice was sent out on July 21, 1986 ("the notice"). Hearing on the matter was scheduled on July 31, 1986, and continued to August 12th and August 20, 1986. Initially, the Committee withdrew its support of the proposed sale to ENESCO in the face of what it considered a better offer from APC. On the morning of Au-

---

**5.** The substance of these arguments highlights the underlying animus motivating the parties. Although not mentioned at the May 6th hearing or in the May 20th order, the escrow agreement that APC signed in connection with the May 20th sale order provided that the debtor not sell to any competitor real estate which would be used for the construction of a power plant. Thus, according to APC, this attempt to sell parcel II to ENESCO was prohibited.

**6.** Debtor's appeal of this order was subsequently withdrawn.

gust 12th, however, the Committee withdrew its support of the APC offer and requested that we approve an "improved" offer from ENESCO. N.T., August 12, 1986, p. 3. Pagnotti was first discussed at the August 12th hearing when counsel for the Committee indicated that one of the terms of the "improved" ENESCO offer allowed Pagnotti to take title to the culm and ash site. N.T. August 12, 1986, p. 7. As a result of the testimony and arguments presented, described in greater detail in the subsequent sections of this memorandum, and on bidding which occurred using the ENESCO offer as a springboard, we entered an order on August 20, 1986 approving the sale of the land and the culm to ENESCO. The language of this order authorizes debtor to grant or convey "to ENESCO, or its nominee ...," an obvious reference to Pagnotti. N.T. August 12, 1986, p. 7.

Our August 20th order specifically incorporates the description of parcel I and the culm, which are both included in an exhibit to an agreement of sale attached to the Committee's motion to sell. That agreement of sale contains two articles: one covering the sale of real estate and one covering the sale of the anthracite culm and disposal site.

ENESCO filed two applications for permission to extend the closing time on the deal. APC responded on January 8, 1987 with a motion seeking to vacate the August 20th order, which it subsequently amended to challenge the sale of the culm. We entered an order extending the closing date to June 30th, 1987. Closing did not occur on or before June 30th, and the parties have proceeded to argue this matter on the assumption that this failure to close constituted a default.

Pagnotti filed a motion on June 25, 1987, requesting that we compel debtor to convey to Pagnotti the culm, site and the ash pit.

The debtor answered Pagnotti's motion and also filed a countermotion requesting that the August 20th order be vacated partially to prevent conveyance of any portion of the cogeneration assets.

Briefs have been submitted.[7] APC joins in the debtor's brief.

We must now intercede in this strange courtship between the Committee, thusfar constantly tempted by the prospects of even better offers, and its two avid suitors, still actively positioning themselves for the ultimate prize. The answers to three intertwined questions underlie our decisions:

1. What is the scope of this Court's power to vacate its previous orders?;

2. Is the August 20th order severable to allow Pagnotti to consummate the culm agreement in spite of a breach on the land agreement?;

3. Was the notice sent to creditors prior to the August 20th sale adequate to describe this sale in light of the subsequent default which has occurred on the land portion of the sale?

We note at the outset that no precedent exists on the specific question of whether a post-sale order default renders defective a previously issued notice of sale. The existing case law does, however, provide a framework for our analysis.

## II  DISCUSSION

Courts have long recognized that a bankruptcy court may, in the exercise of its equitable powers, enter an order setting aside a previous order. *Wayne United Gas Co. v. Owens–Illinois Glass Co.*, 300 U.S. 131, 137, 57 S.Ct. 382, 385, 81 L.Ed. 557, 561 (1937). This power to set aside orders is broad but not unlimited. *Taylor v. Lake (In re CADA Investments)*, 664 F.2d 1158, 1161 (9th Cir.1981).

The basic perimeters of this power to set aside are found in Rule 60(b) of the Federal

---

**7.** Due to the lengthy and complex nature of these proceedings, we specifically requested that the briefs contain only matters of record. Pagnotti notes that the Committee's brief is laden with matters outside of the record. We agree, but will not grant Pagnotti's request that we strike the Committee's brief. Instead, we will

Rules of Civil Procedure,[8] which provided in relevant part:

(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc.

On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (2) newly discovered evidence ... (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party ... (5) ... it is no longer equitable that the judgment should have prospective application; (6) any other reason justifying relief from the operation of the judgment ...

The many subsections of this rule provide a broad spectrum of scenarios in which bankruptcy judges can vacate prior orders. *See e.g., In re Whitney–Forbes*, 770 F.2d 692, 696 (7th Cir.1985) (reviewing bankruptcy court's reliance on Rule 60(b)(4)); *In re Chung King, Inc.*, 753 F.2d 547, 551 (7th Cir.1985) (most common infirmity giving rise to a Rule 60(b) motion is defective notice); *Commonwealth v. Durkalec (In re Durkalec)*, 21 B.R. 618, 619, Bankr.L. Rep., para. 69,055 (Bankr.E.D.Pa.1982) (Rule 60(b) applicable whenever necessary to accomplish justice).

Courts are reluctant to set aside sale orders absent fraud, mistake or similar defects. *See e.g., In re General Insecticide Co.*, 403 F.2d 629, 631 (2d Cir.1968); *In re Webcor, Inc.*, 392 F.2d 893, 899 (7th Cir. 1968), *cert. den. sub. nom. Silver, Inc. v. Webcor, Inc.*, 393 U.S. 837, 89 S.Ct. 113, 21 L.Ed.2d 107 (1968). These defects often correlate to the grounds for relief set forth in Rule 60(b). The rationale for this requirement is that such undiscovered errors prevent a judge from confirming a sale based on accurate knowledge. *In re Chung King, Inc.*, 753 F.2d 547, 552.

Some courts suggest that a finding of fraud or mistake is unnecessary when "compelling equities" outweigh the general goal of finality. *See e.g., Jackson v. Pacific Energy Resources (In re Transcontinental Energy)*, 683 F.2d 326, 328 (9th Cir.1982), *In re CADA Investments*, 664 F.2d 1158, 1161. These "compelling equities" are a basis for relief under the Rule 60(b)(6) discussion of "any other reason justifying relief from the operation of the judgment." The Seventh and Ninth Circuits [9] have cited a Third Circuit opinion for the proposition that "compelling equities" can outweigh the need for finality of judgments. *In re Times Sales Finance*, 445 F.2d 385 (3d Cir.1971), *cert. den. sub. nom. Gross v. Walsh*, 405 U.S. 917, 92 S.Ct. 940, 30 L.Ed.2d 786 (1972). In *Times Sales*, the original bidder on the subject property was not notified, through inadvertent oversight, of the hearing on approval of the sale to another bidder. *Id.* at 385–86. The court held that this was an "innocent mistake," and that the "major question" was one of "common decency." *Id.* at 387. *Times Sales* is consonant with Rule 60(b)(1), which allows relief when a "mistake" has occurred, and Rule 60(b)(6), which allows relief when just.

Our court has recognized the expansive scope of our Rule 60(b)(6) powers in a non-sale context. *In re Durkalec*, 21 B.R. 618. Rule 60(b)(6) allows the liberal exercise of our power to vacate. *Id.* at 620. This power can be exercised when needed to "accomplish justice," and provides a "reservoir of equitable power." *Id.* at 620. Interpreting *Durkalec*, another court found the liberal exercise of the 60(b)(6) power:

... particularly necessary and important when reviewing orders issued in a Chapter 11 case which require continuing conduct of the debtor-in-possession and on

ignore any reference to matters not part of this record.

**8.** This rule is incorporated into our governing bankruptcy rules by N.B.R. 9024. Effective August 1, 1987, Fed.R.Civ.P. 60 was amended to include gender neutral language; it was a technical and not a substantive change.

**9.** *In re Chung King*, 753 F.2d 547, 551; *In re CADA Investments*, 664 F.2d 1158, 1161.

which the success or failure of the rehabilitation might depend.

*C.I.T. Corp. v. Johnson & Morgan Contractors, (In re Johnson & Morgan Contractors )*, 29 B.R. 372, 374, 8 C.B.C.2d 1067 (Bankr.M.D.Pa.1983) (motion to reconsider stipulation terminating adversary).

"Compelling equities" are also a basis for relief under Rule 60(b)(5), which allows relief when it is no longer equitable that a judgment should have prospective application. Although we have found no cases citing this rule in the context of a request to vacate a sale order, the broad equitable reach of Rule 60(b)(5) has been analyzed in other contexts. *See e.g., Marshall v. Bd. of Ed., Bergenfield, N.J.*, 575 F.2d 417, 425 (3d Cir.1978) (not granting relief because clause applies only to "prospective" or "executory" agreements); *American Bank and Trust Co. of Pa. v. Lebanon Steel Foundry (In re Lebanon Steel Foundry )*, 48 B.R. 520, 522 (Bankr.M.D.Pa.1985) (allowing modification of consent decree under unusual circumstances); *Keith County Bank & Trust Co. v. Cannady Supply Co., Inc. (In re Cannady Supply Co., Inc.)*, 6 B.R. 674, 678 (Bankr.D.Kan.1980) (not granting relief because of debtor's failure to make any showing of any unforeseeable events or change in circumstances).

Two sets of policies guide our analysis. The first involves the broad uses of Rule 60(b). As this court has previously noted:

> The principal purpose of 60(b) is to deal with unforseen contingencies. The basic policy tension in determining whether a final judgment should be set aside revolves around whether the factual or legal circumstances have changed to such an extent that the court's interest in deciding the case on the merits outweighs its interests in orderly procedures and the finality of judgments. When strict adherence to the doctrine of res judicata results in injustice being done in light of changing circumstances, the equitable relief of Rule 60(b)(6) is required.

*In re Durkalec*, 21 B.R. 618, 620 (motion for relief from order lifting automatic stay).

In addition to these traditional equitable concerns, the fact that we are reviewing a judicial sale invokes considerations unique to that power. On one hand, we recognize the benefits that finality brings to these sales. *See e.g., In re Chung King, Inc.*, 753 F.2d 547, 550. Knowledge that an order will not be upset at a later date promotes the stability so important in assuring high bids. *See e.g., In re Webcor, Inc.*, 392 F.2d 893, 899. This is particularly significant when parties have expended substantial funds in reliance on the finality of the sale order. *See e.g., In re Zalevsky v. Steele*, 78 B.R. 100, 104 (W.D.Pa.1987). As a countervailing policy, however, ". . . it is of overwhelming importance that the rights of creditors in a concern in bankruptcy should be protected and that a disposal of property on terms which violate this rule should not be permitted to stand." *Proctor & Gamble Mfg., Inc. v. Metcalf*, 173 F.2d 207, 209 (9th Cir.1949). Thus, "(w)here there are even slight circumstances which suggest that there is unfairness to the estate . . . a careful consideration should be had on review and a confirmed sale should be set aside if necessary to rectify the situation." *Id.*

■ We must now consider the specific arguments advanced by the instant parties to determine whether grounds exist to vacate the August 20th order. Pagnotti correctly states the general proposition that receipt of a better offer does not justify the automatic revocation of the underlying sale. *In re Stanley Engineering Corp.*,[10] 164 F.2d 316, 317 (3d Cir.1947), *cert. den. sub. nom. Root v. Galman*, 322 U.S. 847, 68 S.Ct. 351, 92 L.Ed. 417 (1948); *In re Furst*, 57 B.R. 1013, 1015 (E.D.Pa.1986). The corollary of this general rule is that a subsequent offer may require that a sale be vacated if the amount of that offer indicates that the sale price was "grossly

---

**10.** The relevant portion of the *Stanley* opinion is arguably no more than dicta. *Stanley* reviewed the failure of a judge to *confirm* a sale, not the power of a judge to reconsider an order. These two different decisions invoke different levels of discretion. *In re General Insecticide Co.*, 403 F.2d 629.

inadequate." *See e.g., In re Chung King,* 753 F.2d 547, 550; *In re Snyder,* 74 B.R. 872, 878 (Bankr.E.D.Pa.1987); *In re Todem Homes,* 51 B.R. 883, 888 (Bankr.S.D.N.Y. 1985). Pagnotti fails to mention *this* line of cases, which is also relevant to our analysis. *See* discussion, *infra* at p. 860. Pagnotti's whole argument is inapposite, however, because it misconstrues debtor's argument. Debtor is not arguing that a later, higher offer justifies the vacating of this order. *See* Debtor's Memorandum, p. 16. No one alleges that the price memorialized in our August 20th order is inadequate. Rather, an event *other than* the appearance of a new purchaser has decreased the benefit this estate will receive from the sale. Thus, we are not concerned that a decision to vacate the order will destroy the finality of judicial sales by encouraging laxity in future bidding.

Likewise, Pagnotti is correct when it recites the "traditional" grounds upon which confirmed sales are set aside: fraud, mistake, or unfairness. *See* Pagnotti's Memorandum at p. 3.[11] But this statement, standing alone, is unsupported by analysis or by reference to those cases which have delved the outer limits of this general rule.

■ Although both sides indignantly accuse each other of coming into court with unclean hands and impure motives, these allegations do not rise to prove the level of fraud necessary to set aside a sale:

> Unsubstantiated hypotheses and groundless innuendos, no matter how sinister their appearance, are not adequate substitutes for the sort of clear and convincing exhibition of fact required to set aside a confirmed sale by a trustee in bankruptcy.

*In re Transcontinental Energy,* 1 B.R. 460, 463 (Bankr.D.Nev.1979), *aff'd* 683 F.2d 326 (9th Cir.1982). *See also In re Univer-*

sity *Avenue Properties,* 55 B.R. 986, 990 (Bankr.E.D.Wis.1986).

■ The Committee also points to the mistake or infirmity most frequently cited in support of vacating a sale: defective notice to interested parties. *In re Chung King, Inc.,* 753 F.2d 547, 551. In these cases, courts have vacated sales when an original bidder was not sent notice of the hearing on the sale to another bidder. *See e.g., In re Times Sales Finance,* 445 F.2d 385, 386 (lack of notice caused by "innocent mistake"); *In re Zalevsky,* 78 B.R. 100, 102, 107, (lack of notice to bidder constitutes unfairness sufficient to justify setting sale aside); *Felts v. Bishop (In re Winstead ),* 33 B.R. 408, 410 (M.D.N.C. 1983) (notice inadequate); *Lamont v. Grass (In re Lamont ),* 453 F.Supp. 608, 610 (N.D.N.Y.1978), *aff'd mem.* 603 F.2d 213 (2d Cir.1979) (failure to give required notice was a "fundamental error"). Sale orders have also been vacated when creditors were not sent timely notice of a sale. *Wolverton v. Shell Oil Co.,* 442 F.2d 666 (9th Cir.1971); *In re Insulation & Acoustical Specialties, Inc.,*[12] 311 F.Supp. 1209, 1213 (W.D.Mo.1969), *aff'd* 426 F.2d 1189 (8th Cir.1970); *Mason v. Ashback,* 383 F.2d 779, 780 (10th Cir.1967) (sale "wholly illusory" because no notice given to creditors). Failure to send notice to the most recent address of record violates due process and results in a sale voidable at the option of the creditor. *Esposito v. Title Insurance Co. of Pennsylvania (In re Fernwood Markets ),* 73 B.R. 616, 617, 15 B.C.D. 1305 (Bankr.E.D.Pa.1967).

We must consider the relevant Code and Rules provisions to determine whether the instant notice was defective to a degree warranting a decision to vacate. Under 11 U.S.C. § 363(b)(1), sales must occur "after notice and hearing," which is defined by 11 U.S.C. § 102(1)(A) to mean "... after such

---

**11.** Again, we disagree with Pagnotti's citation to *Stanley,* which discusses the initial decision to confirm a sale. *In re Stanley Engineering Corp.,* 164 F.2d 316, 318. Other decisions, however, such as *CADA Investments,* cited by the Third Circuit in *Abbotts Dairies,* contain the same general statement regarding fraud, mistake or unfairness. *In re Abbotts Dairies of Pennsylvania,*

*Inc.,* 788 F.2d 143, 147–48 (3d Cir.1986) (discussing § 363(m)).

**12.** These cases rely upon section 58(a)(4) of the former Bankruptcy Act, 11 U.S.C.A. § 94(a)(4), which provided that all creditors were entitled to at least ten (10) days notice of all sales of property.

notice as is appropriate in the particular circumstances, and such opportunity for hearing as is appropriate in the particular circumstances ..." *See also* N.B.R. 6004(a). The "particular circumstances" of this case include section 4 of the (Fourth Amended) Plan, which requires that all offers to purchase be given to the Court for final approval "... after notice and hearing to members of each class." [13] Rule 2002(a)(2) elaborates, by requiring twenty (20) days notice of such sales. The content of these notices is governed by Rule 2002(c)(1), which states that, subject to Rule 6004:

> ... the notice of a proposed use, sale, or lease of property required by subdivision (a)(2) of this rule shall include the time and place of any public sale, *the terms and conditions* of any private sale and the time fixed for filing objections. The notice of a proposed use, sale or lease of property is sufficient if it *generally describes* the property.

(emphasis added). The case law does little to amplify this vague "terms and conditions" provision of Rule 2002(c)(1).[14]

In the instant case, the notice sent to the creditors describes in relevant part:

> ... a parcel of real estate consisting of approximately 100 acres and more particularly identified in Exhibit "A" to the Agreement of Sale attached to the Committee's Motion, and certain easements over the Debtor's property as more particularly described in Exhibit "E," to The Energy Systems Co., Inc., ("ENESCO") for a purchase price of $410,000 payable by a deposit of $5,000, a further payment of $95,000 upon approval of the Committee's Motion, and the balance to be paid at closing which shall occur within 90 days of the entry of the Order confirming the sale. In the event the Debtors' estate cannot convey the real property

described in Exhibit "A" to the Agreement of Sale, ENESCO is willing to purchase the real property described in Exhibit "B" to the Agreement of Sale for a purchase price of $100,000 payable by a deposit of $5,000 and the balance to be paid at closing. In addition, the Committee seeks authority on behalf of the estate to sell to ENESCO all culm owned by the Debtors ... and the real property on which it is situate ... certain real property known as the Ash Disposal Site ... and certain easements ... ENESCO has agreed to pay $1,500,000 for the Additional Assets if 3,000,000 tons of culm meeting specifications is owned by the Debtors. In addition ENESCO will pay $.50 per ton for any tons of culm over 3,000,000 tons meeting specifications ...

There is no question that the order entered on August 20th is consistent with the Committee's notice. It is ENESCO's subsequent breach which creates a situation in which the sale cannot proceed as noticed. No convenient factual precedent exists to assist us in determining whether this subsequent breach renders the notice defective. However, Rule 60(b)(5) does allow us to consider events subsequent to the sale order in determining whether the prospective operation of the order is equitable. The subsequent event in this case—ENESCO's breach—creates a situation in which the creditors will receive $410,000 [15] less than was originally noticed. Although we do not have in the record the appraisals necessary to make such a determination, and although the price to be paid for the culm is still undetermined, we strongly suspect that the outcome of ENESCO's breach will be a "grossly inadequate" sales price for the estate.

The fundamental essence of the notice requirement also mandates that we find this notice deficient. Appearing more than

---

**13.** This right to receive notice assumes additional importance when we consider that it is the liquidation value of the assets which is to be used to pay creditors. Thus, the creditors get their "last shot" in this case when they approve or object to the proposed sales.

**14.** For example, on the need for explicit reference to the terms of sale in a notice, one court

has held that although it is preferable to include a specific reference to any existing right of first refusal, it is sufficient if the notice refers to the underlying document creating the right of first refusal. *In re Table Talk, Inc.,* 53 B.R. 937 (Bankr.D.Mass.1985).

**15.** This figure would be lower if the Committee lobbies for liquidated damages.

130 times in the Rules, the term "notice" and the related procedures are a cornerstone of bankruptcy practice. The notice requirement is the fulcrum we use to balance a debtor's title 11 protections against the Fifth Amendment guarantee that creditors will not be deprived of "life, liberty or property" without "due process of the law."

Bankruptcy courts interpret notice procedures to balance important due process rights. *See e.g., In re Siegler Bottling Co.*, 65 B.R. 117, 119 (Bankr.S.D.Oh.1986) ("... any such limiting of notices is always subject to the continuing constitutional concept of fundamental fairness embodied in the due process clause of the Fifth Amendment ..."); *In re Hanline*, 8 B.R. 449, 450, 7 B.C.D. 256 (Bankr.N.D.Oh.1981). (Although a court order is not required before the trustee sells property, he must still comply with the "after notice and hearing" provision of § 363(b)).

This balance is no accident. Discussing the changed notice requirements in the new Code, the House Report stated:

> The concept ("after notice and hearing") is central to the bill and to the separation of the administrative and judicial functions of bankruptcy judges ... (it works) a significant change from present law, which requires the affirmative approval of the Bankruptcy Judge for almost every action. The change will permit the Bankruptcy Judge to stay removed from the administration of the bankruptcy or reorganization case, and to become involved only when there is a dispute about a proposed action, that is, only when there is an objection.

H.Rep. No. 95–595, pp. 315, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6272, *reprinted in* 9 Bkr. L.Ed., Legislative History, § 82.15, pp. 322 (1979) (parenthetical added). Although this Court became "involved" in this sale after the objections were raised, our involvement was based on a faulty premise: that the parties were bidding to purchase a complete package. The subsequent breach completely nullified our involvement by changing the ground rules of the sale. This result is completely inconsistent with the free and fair exchange of information necessary to assure an estate the benefits of the highest sale price.

We are aware that this case presents an unusual circumstance because the event rendering the notice defective occurred *after* the parties had their day in court. But nothing in the concept of due process prevents our consideration of such subsequent events. Indeed, the emphasis is consistently [16] upon our ability to consider the special nuances of each situation. As our Supreme Court has noted:

> Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty and property by adjudication be proceeded by notice and an opportunity for hearing appropriate to the nature of the case.

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (statutory notice by newspaper is sufficient only for certain classes of beneficiaries); *Accord, New York v. New York, New Haven & Hartford R.Y. Co.*, 344 U.S. 293, 297, 73 S.Ct. 299, 301, 97 L.Ed. 333 (1953) (Railroad reorganization case; city's failure to file claims excused by lack of proper notice) ("... the statutory command for notice embodies a basic principle of justice that a reasonable opportunity to be heard must precede judicial denial of a party's claimed rights").

Accordingly, we hold that in cases such as the instant, the adequacy of the notice must be assessed in light of the subsequent event which might render the notice defective. Because of the significant difference between the noticed sale terms and price and the terms and price that result from the default, we hold that this notice was defective.

Independently, we must also consider whether any "compelling equities"

---

**16.** *See* Rule 60(b)(5) ("... it is no longer equitable that the judgment should have prospective application"); Rule 60(b)(6) ("... any other reason justifying relief ...").

should prompt a contrary decision. We find that the following circumstances coalesce to create "compelling equities" in favor of vacating the order: (1) the parties intended to create a non-severable agreement, as evidenced in their testimony, the procedural history of this case and the content and structure of the August 20th order; (2) the nature of the post-confirmation breach was such that we could not have rendered the August 20th order had we known the sale would result in partial default; (3) countervailing equities do not tip this scale in Pagnotti's favor.

We find that the parties intended that this be a nonseverable package deal for the land and the culm. This intention, coupled with the dramatic difference in the intended and actual purchase prices, creates "compelling equities" sufficient to invoke our Rule 60(b)(6) power. The emphasis throughout these proceedings has been on the need to create the best package deal on the land and the culm. *See e.g.*, N.T. June 24, 1986, p. 3 (escrow agreement in the original APC sale required a separate culm agreement), p. 4 (Committee knew of no other culm purchaser), p. 24 (Committee's query whether estate would be better off receiving a $100,000 land deal from ENESCO or a million dollar package from APC); N.T. August 12, 1986, p. 7 (Committee's Statement that agreement was set up "... to guarantee that the estate will receive a certain minimum dollar amount for its culm ..."); N.T. August 20, 1986, p. 2 ("We are here today to hear if there will be competitive bidding on the springboard bid of ENESCO for the land, the culm and the miscellaneous assets."), p. 2–3 (terms of bid indicated that whoever offered the highest amount for both assets would be the win-

ner), p. 3 (notice of sale included all assets which Committee was seeking to sell).

The parties did not intend that this agreement be severable. *See e.g.*, N.T. August 12, 1986, p. 7 (Committee counsel's statement, not refuted, that "(w)ith respect to the sale of the culm, the buyer has assigned its rights to buy the culm to a company called Pagnotti Enterprises, Inc. However, ENESCO will remain liable as a co-obligor for the purchase price of the culm."); [17] p. 47 (testimony of Clarence J. Heller, vice-president of ENESCO, that the culm is essential from ENESCO's prospective); N.T. July 31, 1986, p. 16 (testimony of APC representative William Seizer that APC was offering, as part of this bidding process, to buy all of the assets together and none of them separately); pp. 23, 48, 49 (APC and ENESCO agreeing that in the event of default of high bidder, the second highest bidder could acquire land and culm together for the second highest bid).

The language in the August 20, 1986 order, as drafted by these parties, further evidences that the parties did not intend that this sale be severable. The order describes both the land and the culm and orders that debtor is authorized to convey the property "upon receipt of the *full consideration* as set forth above." (emphasis added).

Aside from these expressions of intention, there is another critical reason why the failure to perform rises to the level of a "compelling equity" demanding vacation of this order. One court has described what it refers to as "minor errors," noting that "(*l*)ater discovery of minor errors in the judicial sale process does not demonstrate that the judge was prevented from rendering a fair determination." *In re Chung King, Inc.*, 753 F.2d 547, 552.[18] When an

17. The Committee staunchly argues that this agreement is nonseverable in accordance with the intentions of the parties. We feel constrained to note, however, a short colloquy which occurred between counsel for APC and counsel for the Committee, N.T. August 12, 1986, p. 15, which might be interpreted as the Committee's statement that the agreement is severable. Such an interpretation is tenuous, however, since counsel's statement is qualified by the phrase "without your first hypothetical ..." It is unclear from the record exactly what

hypothetical is being identified. We refuse to view this as the Committee's position, however, because is directly contradicts all of the other Committee statements as noted in this memorandum. We suspect that counsel spoke too quickly in response to a hypothetical that he had not had the time to fully consider.

18. The *Chung King* court continued to suggest that a minor error in procedure coupled with a later, higher offer should not be sufficient to set aside a sale.

error has been uncovered, which, had it been exposed at the time of the sale order, would have prompted the judge to have rendered a different opinion, such an error is a fundamental error and may provide a basis for vacating the underlying order.

In the instant case, the obvious response to this analysis is that there was no error *at the time* that the August 20th order was signed. A later event occurred which impacted upon the significance of the order. Such later events can serve to trigger a vacating order, as in the scenario of the "grossly inadequate" sale order. *See* discussion, *supra*, p. 859. Indeed, the wording of Rule 60(b)(5) suggests that events may occur after an order is signed which make it unfair for the order to operate prospectively. *See* discussion, *supra*, p. 858.

The undiscovered defect in the instant case is ENESCO's inability to complete this sale. We find that this is a fundamental defect that, had it been known to us on August 20th, would have resulted in our refusal to sign the August 20th order. That order contains the court's conclusion that this sale "... is fair and reasonable," and that the purchase price is "... in the best interest of this estate and its creditors ..." This conclusion was the result of our review of what we (and these parties) viewed as a non-severable package for the land and the culm. The *Abbotts Dairies* decision requires that we make, explicitly or implicitly, such a finding of good faith. *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149–50 (3d Cir.1986). We could not have made any such conclusion in the instant case because the subsequent breach altered the ultimate benefit to the estate. ENESCO and Pagnotti were aware that this was a package deal so that a failure to perform by one would completely alter the package of benefits.

The equities in this case do not cut in favor of Pagnotti. We reject Pagnotti's argument that the other parties are estopped from arguing at this late date that the notice was defective. Counsel were justified in relying on the notice; it expressed the intention of these parties that this agreement be non-severable. They objected when they became aware that the sale terms as noticed would not reflect the consummated agreement.

We are left with debtor's countermotion. Even assuming that this is properly in front of the Court,[19] debtor fails to draw the fine distinction necessary to carry the countermotion. We have held that the notice preceding the August 20, 1986 sale was sufficiently defective to nullify the underlying sale. Debtors want to keep that sale order alive for a very limited purpose. Unfortunately, they have not had the opportunity to make the equitable showing would be necessary to support a decision in their favor. We are putting the parties back to "square one"—again.

### ORDER

AND NOW, this 1st day of June, 1988, it is hereby ORDERED that the August 20, 1986 order in this case is hereby VACATED, which will therefore

1. GRANT in part and DENY in part the January 22, 1987 Amended Motion of APC—Alternative Power Corporation;

2. DENY the June 25, 1987 Motion of Pagnotti Enterprises, Inc.

---

**19.** This pleading is not docketed, apparently having been handed up to the bench during a hearing. More significantly, it was not scheduled to be heard at the June 30, 1987 hearing.