MALDEN MILLS INDUSTRIES, INC., Plaintiff, Appellee,

v.

Ronald ALMAN, et al., Defendants, Appellants.

No. 91–1938.

United States Court of Appeals, First Circuit.

Heard Feb. 4, 1992.

Decided June 29, 1992.

Charles W. Johnston with whom Handler, Gerber, Johnston & Aronson, Camp Hill, Pa., was on brief, for appellants.

E. Randolph Tucker with whom Ben T. Clements and Hill & Barlow, P.C., Boston, Mass., were on brief, for appellee.

Before TORRUELLA, Circuit Judge, COFFIN and CAMPBELL, Senior Circuit Judges.

LEVIN H. CAMPBELL, Senior Circuit Judge.

This appeal concerns a dispute between a multiemployer benefits fund and a former contributing employer. The Fund appeals from a judgment in favor of the employer, Malden Mills Industries, Inc. The United States District Court for the District of Massachusetts found—on the basis of a comprehensive stipulation of the undisputed facts and after hearing oral argu-

ment [1]—that Malden was not liable to make any additional contributions to the Fund nor to reimburse the Fund for payments previously made in connection with the distribution of vacation benefits to Malden Employees. We affirm.

## I.

We summarize the relevant stipulated facts. Defendants-appellants, Ronald Alman, et al., are the trustees of a multiemployer employee benefits plan known as the International Ladies Garment Workers Union Eastern States Health and Welfare Fund, formerly known as the Northeast Department International Ladies Garment Workers Union Health and Welfare Fund (the "Fund"). [2] The Fund provides health and welfare benefits, including vacation benefits, to employees of contributing employers covered by collective bargaining agreements. Benefits distributed by the Fund are funded by employer contributions and by investment income earned on employer contributions. Plaintiff-appellee, Malden Mills Industries, Inc., ("Malden") is an employer in the garment industry. At the time the dispute arose, approximately 850 of Malden's employees were members of the International Ladies Garment Workers Union or its local affiliates (the "Union").

Prior to 1950, pursuant to collective bargaining agreements with the Union, Malden paid annual vacation benefits directly to its eligible employees. The payments were based on a percentage of each eligible employee's wages during the preceding twelve month period. [3] Beginning in 1950, Malden began participating in the Fund as a contributing employer. Pursuant to each collective bargaining agreement between Malden and the Union, including the 1983 collective bargaining agreement, Malden would make periodic benefit contributions to the Fund, a portion of which was for vacation benefits, and the Union would cause the Fund to distribute vacation benefits to eligible Malden employees. Under the collective bargaining agreements, the Fund paid vacation benefits to each eligible Malden employee in a single annual payment made in June of each year. The amount of the vacation benefit in any given year was based on a percentage of the employee's wages during a preceding twelve month period. [4]

The vacation benefit plan, as administered by the Fund, operated as a simple pass-through. Thus, the amount of a Malden employee's vacation pay benefit in one year corresponded to the amount of Malden's vacation pay contributions on behalf of that employee in the preceding calendar year. Because, however, the Fund pays all types of benefits from a single pooled fund and does not account separately for contributions according to the contribution period or the type of benefit, it is difficult if not impossible for the Fund to ascertain whether, or to what extent, vacation benefits paid to employees in a particular year have been funded by contributions made by their employer.

In October 1986, Malden and the Union began negotiating a new collective bargaining agreement in anticipation of the expira-

1. The parties filed cross-motions for summary judgment on the basis of the stipulated factual record. Pursuant to the parties' agreement, the district court treated the stipulated record as constituting a trial and heard oral argument.

2. At all relevant times the Fund has been a "multiemployer plan" within the meaning of section 3(37) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(37), as well as an "employee welfare benefit plan" within the meaning of section 3(1) of ERISA, 29 U.S.C. § 1002(1).

3. Malden employees were paid on an hourly basis. They were not given their hourly pay during the two week vacation shutdown when they did not work. Instead, they were given a vacation pay benefit based on a percentage of their salary.

4. The amount of vacation benefits paid by the Fund to Malden employees was determined in the following manner. Each year, in or about January, Malden provided to Leader Data, Inc., a computer firm retained by the Fund, a list showing the W–2 income for each Malden employee during the preceding calendar year. Leader Data then calculated the amount of each employee's vacation pay benefit in accordance with the employee information Malden provided, generated checks and sent them to the Union for distribution in June.

tion of their 1983 Collective Bargaining Agreement. The 1983 Collective Bargaining Agreement was to expire on November 30, 1986. During negotiations, Malden and the Union both expressed dissatisfaction with the Fund's administration of vacation benefits. The parties agreed that under the 1986 Collective Bargaining Agreement, Malden would resume paying vacation benefits directly to its employees in lieu of Malden's continued participation in the Fund. Malden and the Union could not agree, however, whether or not Malden's employees were entitled to vacation benefits from the Fund in June of 1987, based on the contributions Malden had already made to the Fund in 1986. Malden contended that under the expired collective bargaining agreement, its 1986 contributions to the Fund[5] paid for vacation pay benefits for its employees for June 1987. According to the Union, however, the June 1987 benefits were paid for by contributions made in the *immediately* preceding twelve month period (June 1986—May 1987). Accordingly, the Union contended that Malden would owe an additional five months of contributions (January 1987—May 1987) in order to fully compensate the Fund for a June 1987 vacation benefits distribution.

On May 15, 1987, Malden and the Union signed a "Settlement Agreement" which established the terms of a new collective bargaining agreement (the "1986 Collective Bargaining Agreement"). Under the 1986 Collective Bargaining Agreement Malden and the Union agreed that Malden would pay vacation benefits directly to Malden employees beginning with the June 1988 benefit distribution. The formula for computing the amount of vacation benefits payable to eligible employees was to remain the same as set out in the 1983 Collective Bargaining Agreement. The Settlement Agreement incorporated by reference a letter dated May 11, 1987 (the "Letter Agreement") which addressed the unresolved dispute as to whether or not Malden's employees were entitled to vacation benefits from

the Fund in June 1987 based on Malden's 1986 contributions to the fund. The Letter Agreement stated the positions of the parties as follows:

> The Employer [Malden] takes the position that its contributions to the [Fund] with respect to the 1986 calendar year fully paid and provided for the vacation pay benefits to be provided by such Fund to Employees during 1987. The Trustees of such Fund nevertheless claim that the Employer must, for and with respect to the period from January 1, 1987 through May 31, 1987 continue to contribute to such Fund for and in respect of the vacation pay benefits so to be made by such Fund during 1987, in amounts determined in accordance with the old collective bargaining agreement between us dated as of December 1, 1983.

The Letter Agreement further provided that the Union would cause the Fund to pay the vacation pay benefits in 1987 "notwithstanding the pendency and outcome or resolution of such dispute." While Malden was not immediately required to make the additional five months in contributions, the Letter Agreement provided that "[e]ither the Employer, the Union or the Trustees of such Fund may initiate an arbitration proceeding or a court proceeding to resolve the above dispute."

Pursuant to the Letter Agreement, in June 1987 the Fund advanced $673,510.70 of vacation pay benefits to Malden's employees. In addition the Fund made employer FICA withholding payments associated with those benefits in the amount of $48,156.00. Malden made all vacation pay contributions due to the Fund for the period from January 1, 1986 through December 31, 1986. As further contemplated in the Letter Agreement, Malden filed a complaint in the district court on January 23, 1989, seeking a declaratory judgment establishing that Malden was not obligated to make additional contributions for vacation pay benefits to the Fund. In its complaint, Malden alleged that the Union had actual

---

5. Malden had made contributions to the Fund through November 1986—the date when the 1983 Collective Bargaining Agreement expired.

Malden agreed to make additional contributions in December 1986 to fully fund the June 1987 benefit distribution.

and apparent authority to act for the Fund as its agent in negotiating Malden's obligation to make contributions to the Fund. Malden further alleged that the Fund's and the Union's statements, and their course of conduct, manifested an understanding that vacation benefits distributed by the Fund to Malden employees were funded by contributions made in the preceding calendar year. Consequently, Malden alleged that the June 1987 vacation benefits distributed by the Fund were fully funded.

The Fund denied that vacation pay benefits were funded from contributions made in the preceding calendar year. The Fund contended that the Union inaccurately stated its position in the Letter Agreement.[6] In the district court the Fund took the position that regardless of the contributions that Malden made to the Fund, the Fund was under no obligation to pay for the June 1987 benefits to Malden employees because under its eligibility Rules, Malden employees ceased to be entitled to any vacation benefit distributions once Malden ceased to be a contributing employer in December 1986. Accordingly, the Fund counterclaimed seeking to recover $673,-510.70 from Malden as reimbursement for the full amount of vacation pay benefits advanced to the Malden employees in June 1987 and $48,156.00 for the FICA withholding payments. In the alternative the Fund sought to recover from Malden contributions for the period between January 1987 through May 1987.

The district court found that the contributions that Malden made during calendar year 1986 were intended to fund the payment of benefits in June 1987. The court further found that the Fund's eligibility rules could not be reasonably interpreted to require Malden to reimburse the Fund for the June 1987 benefits distribution notwithstanding the fact that Malden's 1986 contributions fully funded that distribution. Consequently, the court denied relief to the Fund and entered judgment in favor of Malden, absolving it of any liability to the Fund. This appeal followed.

## II.

There are two issues on appeal. The first is whether the district court erred in finding that—under the contractual arrangements between Malden, the Fund and the Union—the vacation benefits distributed by the Fund in June 1987 were funded by Malden's contributions made in the immediately preceding *calendar* year (i.e., January 1986—December 1986). The second is whether as a matter of law—regardless of the district court's findings as to whether or not the June 1987 benefits were pre-funded—the Fund is entitled to a full reimbursement from Malden of the 1987 vacation benefit distribution to Malden's employees, given the Fund's eligibility Rules forbidding distribution of benefits to employees of noncontributing employers. We address each of these issues in turn.

### A. *Matching Contributions to the June 1987 Benefits*

As mentioned, the original dispute began during the negotiations between Malden and the Union over the 1986 Collective Bargaining Agreement. While both parties agreed that the Fund should no longer be involved in administrating vacation pay benefits to Malden employees, they could not agree whether—pursuant to the 1983 Collective Bargaining Agreement—Malden's contributions to the Fund in calendar year 1986 had fully funded the June 1987 vacation pay distribution. The only issue, according to the Letter Agreement between Malden and the Union, was whether or not Malden owed the Fund an additional

---

**6.** The parties stipulated that the Union informed Malden that the Letter Agreement stated the Fund's position. Subsequently, months after Malden and the Union signed the Letter Agreement and after the Fund had distributed the June 1987 benefits in accordance with the Letter Agreement, a representative of the Fund informed Malden that the Letter Agreement did not accurately state the Fund's position. According to the representative, the Fund's position was that no vacation pay benefits were due to Malden employees in 1987 unless Malden made vacation pay contributions for the entire calendar year 1987. In the district court the Fund reformulated its position and asserted instead that regardless when contributions funded benefits, Malden employees were ineligible for benefits in June 1987.

five months of contributions, it being the Fund's contention that distributions were funded from contributions made in the twelve months immediately preceding the month of distribution.

In the district court neither party was able to present documents memorializing their original agreement as to how the fund operated with regard to contributions and benefits.[7] Malden maintained, nonetheless, that its 1986 contributions fully paid for the Fund's June 1987 distribution to Malden employees. Malden noted, first, that in the joint statement of stipulated facts the Fund had agreed that,

> [a] Malden employee could not receive a vacation pay benefit which was greater than the amount of vacation pay contributions owed to the Fund on account of that employee's earnings during the preceding calendar year. Similarly, the amount of vacation benefit payments made to all Malden employees by the Fund in each year could not exceed the amount of vacation benefit contributions owed by Malden on account of those

employees for periods during the preceding calendar year.

Second, Malden presented the affidavit of Michael G. Reeve, Malden's Assistant Treasurer, since 1983. Reeves averred that he "reviewed computer printouts produced by the Fund in this case ... show[ing] the actual amount of vacation pay benefits paid by the Fund to Malden employees during the calendar years 1985, 1986 and 1987." He compared this data with the available data from Malden payroll and contribution records for a representative sample of 30 Malden employees for the calendar years 1984, 1985 and 1986. Giving particular attention to employees whose salaries increased during the year, Reeves was able to demonstrate that throughout 1985–1987, the amount of benefits a particular employee received from the Fund corresponded exactly to the amount Malden contributed on behalf of that employee in the prior calendar year.[8]

Finally, Malden presented evidence of correspondence between itself and a representative of the Fund concerning the payment of FICA withholding taxes on the

---

7. In an attempt to determine how the Fund operated the district court asked both parties at the oral hearing if they could tell the court "when the fund first came in, when did it start paying benefits." The Fund's attorney responded "[w]e searched, we looked, we couldn't find this out." Malden's attorney added "[i]t is not in the record, your Honor." The Fund then commented further "[i]t is not in the trial record, your Honor. That was something that Mr. Tucker [Malden's attorney] searched for very diligently because he wanted to prove that fact. He wanted to prove that it was prefunded."

8. To demonstrate his point, Reeves gave several examples of benefits paid and contributions made on behalf of "split" year employees. Under Malden's collective bargaining agreements the amount of vacation benefits an employee received (and therefore the amount of contributions Malden made to the Fund on behalf of that employee) was based on that employee's seniority. Malden contributed 4% of an employee's salary for employees who were at the company five years or less, 5% for those who were employed five to ten years and 6% for those who were employed from ten to fifteen years. A "split" year employee was an employee whose seniority changed in the middle of the year and for whom the amount of contributions

Malden made to the Fund was prorated accordingly.

> For example, Reeves described an employee who was hired on April 1, 1980.
> [T]hat employee would reach his five year anniversary date on April 1, 1985. Prior to April 1, 1985, Malden would contribute to the Fund 4% of that employee's gross monthly wages. For the remainder of 1985, Malden would contribute to the Fund at the rate of 5% of that employee's gross monthly wages. Payments of vacation pay benefits by the Fund to Malden employees who moved from one seniority category to the next equalled the amount that Malden had contributed for that employee for the prior calendar year. In the example stated in the preceding paragraph, the employee would receive a benefit in June of 1985 equal to 4% of his gross wages during the calendar year 1984, the amount Malden had actually contributed on behalf of that employee for calendar year 1984. In June of 1986, the employee would receive a pro-rated benefit, equal to 4% of the employee's gross wages from January 1, 1985 through March 30, 1985 and 5% of that employee's gross wages from April 1, 1985 through December 31, 1985.

The data Reeves presented in his affidavit for actual employees verified his description of how the Fund operated.

vacation pay benefits distributed by the Fund. In a February 20, 1975 letter from Richard Langerman, Malden's attorney, to Harvey Gold, Assistant District Manager of the Union, Langerman expressed his understanding of the operation of the Fund as follows:

As I understand it, the Welfare Fund accumulates money to distribute in the form of vacation benefits during each year, and then actually distributes those vacation funds to members employed by the company sometime during May or June of the succeeding calendar year. Therefore, Malden's payment of FICA taxes would not be due until that distribution in May or June, even though the funds for distribution had been accumulating during the preceding calendar year.

From June 1977 to June 1982, Malden, with the Union's agreement, implemented the proposal set forth in Mr. Langerman's letter regarding payment of FICA taxes. Both parties jointly stipulated that throughout Malden's communications regarding its liability for FICA taxes on vacation benefits distributed to Malden employees, Malden manifested an understanding that vacation benefits paid by the Fund in a given year were funded by Malden's contributions to the Fund for the preceding calendar year. At no time during those communications did the Union state or otherwise suggest that Malden's understanding was in error.

To rebut Malden's position, the Fund relied on essentially a single piece of evidence.[9] The Fund pointed to Section 9.1(b) of the Rules governing the Fund (the "Fund Rules"), which states that—for purposes of the benefits eligibility requirements—

June and December [b]enefits are payable to the worker out of contributions made to the Fund in the benefit year in which the benefits are paid. However, it is difficult to ascertain what those contributions are with respect to a particular worker in the current year. Therefore,

the worker's earnings during the preceding year will be used as a basis for estimating the worker's earnings in the current year to determine the amount of benefits payable to an otherwise eligible worker.

Because the 1986 Collective Bargaining Agreement incorporated the Fund Rules by reference, the Fund urged that Malden was bound by this understanding.

■ At the close of the hearing, the district court found that

the ongoing arrangements that had existed, taken together with the terms of the collective bargaining agreements reflects an arrangement in which contributions were required to be made and were, in fact, made by Malden Mills during a calendar year paid to the fund to fund the payment of benefits by the fund to the employees in June of the year following that calendar year.

We review a district court's findings of fact only for clear error. Fed.R.Civ.P. 52(a).

The Fund insists on appeal that "the record makes it clear that Malden has not presented enough 'evidence' even to support its overly simplistic theory that benefits in one year are 'actually' paid from contributions made the preceding year." According to the Fund, Malden's position was necessarily rooted in a notion that, over the life of its participation in the Fund, it paid more in contributions than its employees received in benefits. Such a theory, says the Fund, required proof of what happened during the first year. Such proof was lacking. The Fund goes on to argue that, because—like virtually every multiemployer, pooled welfare plan—it does not segregate its accounting records by employer,

neither [the Fund] *nor Malden* could ever really determine where any specific contribution dollars end up in the large, pooled fund. Simply put, there is no way to ever prove that there is a direct link-

---

**9.** Most of the Fund's arguments before the district court rested on the notion that regardless of how the Fund operated with regard to distri-

butions, under its Rules it did not have to pay vacation benefits in June 1987. *See infra.*

age between contributions in one year and benefits in the next.[10]

■ We see nothing "clearly erroneous" in the district court's finding that Malden had pre-funded the June 1987 vacation benefit distribution with its 1986 contributions. It is true neither party could show conclusively what happened in the first year of Malden's participation, nor was there conclusive evidence of an agreement matching contributions and benefits. But there was circumstantial evidence supportive of the court's determination. There was strong evidence that, in practice, the Fund administered benefits in such a way that benefits distributed in one year were funded from the previous years contributions. Both parties stipulated that the amount of benefits a particular employee received was based on a percentage of that employee's salary in the preceding calendar year. The district court reasonably rejected the Fund's reliance on its "deemed payable rule"—which states that "June and December [b]enefits are payable to the worker out of contributions made to the Fund in the benefit year in which the benefits are paid."[11] The district court concluded,

> as fact finder I expect to find in the absence of some evidence that shows me that I should determine otherwise, that it would be the natural thing to expect that [the 12 month period used to calculate benefits and the 12 month period for the contribution] would be the same. They don't have to be the same. But if I don't have any evidence to show me on what basis I would find some other calendar, some other 12 month period. And, if so, what 12 month period beginning when and ending when, then I will find, as fact finder, that the practice that was being used supports circumstantially an inference that the 12 month period for the contributions was the same as the 12 month period for calculation of benefits.

> \* \* \* \* \* \*

> [M]y inference from the circumstantial evidence of how this thing operated over the years is that unless I can find something to the contrary here, that is the way I should find that it was.

The Fund presented no evidence to the contrary—circumstantial or otherwise—and we can see no clear error in the court's conclusions.

■ There is little to the Fund's assertion that multiemployer funds can never be expected to know how contributions and benefits match-up upon an employer's withdrawal. Under 29 U.S.C. § 1103(c)(3), a Fund may return overpayments of contributions to a contributing employer without violating ERISA's anti-inurement provision which provides that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants." In addition, this circuit has recognized—as have other circuits—a federal common-law right to restitution for overpayment of contributions by an employer to a Fund. *Kwatcher v. Mass. Service Employees Pension Fund,* 879 F.2d 957, 966 (1st Cir.1989); *see, e.g., Jamail, Inc. v. Carpenters District Council of Houston Pension, etc.,* 954 F.2d 299 (5th Cir.1992); *Plucinski v. IAM Nat'l Pension Fund,* 875 F.2d 1052, 1057 (3d Cir.1989); *Whitworth Bros. Storage Co. v. Central States, Southeast and Southwest Areas Pension Fund,* 794 F.2d 221, 235–36 (6th Cir.), *cert.*

---

10. The Fund contends that because any system requiring a separate accounting of contributions received and benefits paid for a particular employer would be contrary to the very "risk-spreading" and "economies-of-scale" notions that are the underlying reasons for the existence of pooled funds in the first place, "it is never proper in a self-insured, multiemployer pooled welfare fund to analyze, as Malden urges, the "benefits versus contributions" history of one individual employer upon its withdrawal (even if that were possible)."

11. The district court thought the Rule, by its terms, dealt with "eligibility and entitlement to benefits," not with contributions. In its reply brief on appeal, the Fund conceded that "[t]he constructive rule in Section 9.1(b) is admittedly a legal 'fiction,' but," the Fund went on to say "it is one to which Malden agreed to be bound in its 1983–1986 collective bargaining agreement." Whether or not Malden agreed to be bound by this rule, the district court—not unreasonably—found that it was not a rule which affected Malden's obligations vis-a-vis its contributions to the Fund.

*denied,* 479 U.S. 1007, 107 S.Ct. 645, 93 L.Ed.2d 701 (1986); *Chase v. Trustees of Western Conference of Teamsters Pension Trust Fund,* 753 F.2d 744, 749 (9th Cir.1985); *Peckham v. Board of Trustees,* 724 F.2d 100, 101 (10th Cir.1983); *Teamsters Local 639–Employers Health Trust v. Cassidy Trucking, Inc.,* 646 F.2d 865, 868 (4th Cir.1981). Both § 1103(c)(2) and the case law's recognition of an employer's right to restitution, strongly suggest that Funds may be held accountable, in appropriate circumstances, for the contributions they receive. This fact runs counter to the Fund's assertion that it is never proper in a self-insured, multiemployer pooled welfare fund to analyze the "benefits versus contributions" history of one individual employer upon its withdrawal. As we said in *Kwatcher,* actions for restitution will not endanger pension funds' solvency because they "seek only the return of amounts actually paid to, and unjustly retained by, pension funds[—] ... 'participants and beneficiaries are not entitled to funds to which they had no right in the first place.'" *Kwatcher,* 879 F.2d at 967 (citation omitted).

We hold that the district court's finding that Malden's contributions to the Fund in calendar year 1986 pre-funded the Fund's distribution of benefits in June 1987 was not clearly erroneous.

**B. *Is the Fund Entitled to Reimbursement as a Matter of Law***

Even if the arrangement between the parties was such that Malden's contributions pre-funded the Fund's annual distributions to Malden employees, the Fund says it is entitled to reimbursement from Malden for the full amount of the June 1987 distribution *as a matter of law.* The Fund seeks to recast the dispute as one concerning the Malden employees' eligibility to have received benefits, as opposed to one concerning Malden's obligation to pay contributions. According to the Fund, Malden's obligation to reimburse the Fund is dependent on whether the Fund was under a legal obligation to pay vacation benefits

to Malden employees in June 1987. The Fund's obligation to pay benefits is, in turn, dependent on whether Malden's employees were eligible for benefits in June 1987. Accordingly, the Fund contends that this Court should apply the well established principles under ERISA concerning eligibility for benefits under a multiemployer fund, and on the basis of those principles determine whether the Fund was obligated to pay the disputed benefits to the Malden employees. Viewing the dispute from this perspective the Fund concludes that, under its Rules, the Malden employees were not eligible for benefits in June 1987. As a matter of law, therefore, it is supposedly entitled to reimbursement from Malden for the benefits it was forced to pay pursuant to the Letter Agreement. We disagree.

ERISA dictates that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). The Fund in this case was governed by the Basic Plan of the Northeast Department ILGWU Health Fund as amended August 20, 1985 ("Basic Plan") [12] and the Rules of the Northeast Department ILGWU Health and Welfare Fund, as amended February 23, 1984 ("Plan Rules"). Article I, section 5(a) of the Basic Plan provides that "[t]he Board of Trustees may adopt procedures and promulgate rules to effectuate the provisions of this Plan...." Pursuant to this authority the trustees adopted rules specifically governing the eligibility requirements for benefit recipients. The Fund contends that these rules are clear and unambiguous in providing that eligibility for vacation pay benefits is conditioned upon, among other things, attachment to a currently contributing employer at the time of benefit distribution. Section 1.6 of the Plan Rules generally provides for immediate termination of eligibility for employees who accept employment with a noncontributing employer:

> Irrespective of any eligibility rights under this Section, a covered worker who accepts employment in a supervisory capacity, in a non-covered craft, or with an employer which does not contribute to

---

12. The Basic Plan was also the Fund's written trust agreement.

the Fund shall lose coverage immediately.

Section 7(b)(6) of the Plan Rules further provides that:

The action of the Board shall provide for:

\* \* \* \* \* \*

(6) the establishment of rules of eligibility in accordance with the principle that entitlement to [vacation pay] benefits shall be limited to persons who shall be covered workers at the time of payment of benefits and shall be based upon past service which each worker shall have rendered in the industry; ....

Finally, with respect to vacation benefits specifically, Section 9.1 of the Plan Rules provides in pertinent part:

In order to be eligible to receive a cash welfare benefit or vacation benefit in June or December, a covered worker must meet all eligibility requirements other than the Earnings Test requirement and must meet all three of the following requirements:

\* \* \* \* \* \*

(c) The worker at the time of the distribution of benefits must be both attached to the ladies' garment industry and to a shop covered by an agreement requiring contributions to the Fund.

Based on these Rules, the Fund argues that Malden's employees were not eligible for vacation benefits in June 1987 because Malden ceased to be a contributing employer in December 1986. Accordingly, the Fund contends, it was under no obligation to distribute benefits and Malden, therefore, must reimburse it for all benefits paid in July 1987.

The Fund advances a somewhat tortured two step argument as to why the Malden employees' ineligibility for benefits in June 1987 makes Malden liable to reimburse the Fund for the full amount of the distribution it made.

First, the Fund contends that Malden specifically agreed to be bound by the Fund's Rules. Article XVIII of the 1983 Collective Bargaining Agreement acknowledges the Union's establishment of various funds—including the Fund involved in this appeal—and provides in pertinent part that:

2. Each of the respective Boards of Trustees which administers any of the foregoing described Funds shall adopt and promulgate such By–Laws, Rules and Regulations as it may deem necessary or desirable to effectuate the purposes of the respective Funds, including the detailed basis upon which payments from the respective Funds will be made to any beneficiary and shall have the power to alter, amend or modify said By–Laws, Rules and Regulations from time to time.

\* \* \* \* \* \*

4. The parties hereto agree to be bound by the provisions of the By–Laws, Rules and Regulations of each of the respective Funds. They are hereby incorporated in and made a part of this Agreement.

While the Settlement Agreement between the parties deleted this language with respect to the 1986 Collective Bargaining Agreement, it did so "without prejudice to the Vacation Pay Dispute" as set out in the Letter Agreement.

Even if Malden had not specifically agreed to be bound by these Rules in its collective bargaining agreements with the Union, the Fund contends that Malden would still be bound by the Fund's rules as a matter of law. As the Eleventh Circuit held in *Plumbers & Steamfitters Local No. 150 Pension Fund v. Vertex Construction Co.*, 932 F.2d 1443, 1450–52 (11th Cir.1991), as a matter of law, "an employer who, pursuant to a collective bargaining agreement, makes contributions to an employee benefit trust fund governed by ERISA, is bound by the trust agreement for that fund, despite the fact that the trust agreement is not incorporated in the collective bargaining agreement." The Fund concludes that because Malden was legally bound by the Fund's Rules, and because under its Rules the Malden employees were not eligible for benefits in June 1987, the dispute over who should pay the June 1987 benefit, as set out in the Letter Agreement, should be resolved in the Fund's favor—notwithstanding the dis-

trict court's finding that Malden's 1986 contributions to the Fund pre-paid the 1987 distribution.

Second, the Fund argues that the court should interpret the Letter Agreement between Malden and the Union as manifesting a promise by Malden to reimburse the Fund for the full amount of the benefits paid in June 1987 if it is determined that the Fund had no obligation to pay those benefits in the first place. While the Fund acknowledges that a literal reading of the Letter Agreement suggests that if the Fund prevailed in the underlying dispute, Malden's liability would be limited to an additional five months of contributions, the Fund argues that the court should interpret the Letter Agreement more broadly. In support of this interpretation, the Fund asserts that the Letter Agreement incorrectly stated its position as seeking only an additional five months contributions from Malden. As stipulated in the district court, the Fund maintains that, in fact, its position was that vacation pay benefits are deemed payable out of contributions made in the calendar year of distribution. Based on this position, if the Fund prevails in the underlying dispute, Malden would have to reimburse the Fund for the full amount of benefits it was required to pay pursuant to the Letter Agreement. Moreover, the Fund argues that notwithstanding the incorrect reference to the five month period in the Letter Agreement, the very structure of the arrangement compels the interpretation that Malden is contractually required to completely reimburse the Fund for the disputed benefits advanced if it prevailed in the underlying dispute. According to the Fund the sentence in the Letter Agreement which incorrectly stated its position was not a contract term which set the maximum parameters of the relief to be provided to the Fund in the event that the underlying dispute were resolved in its favor. Instead, the Fund argues, the statement was simply a matter of background purporting to describe what the underlying dispute was all about.

■ We find the Fund's arguments to be devoid of merit. As an initial matter we agree with the district court that the Fund's eligibility rules should not control the outcome of a dispute between the Fund and Malden regarding contributions. The current posture of the case is such that the only question before this court is whether Malden owes some amount of additional contributions to the Fund pursuant to the parties' contractual agreements. It may well be that, under the Fund's Rules, the Malden employees were not eligible for the June 1987 distribution. If that is the case, however, the Fund should seek reimbursement from the employees not the employer. As the district court stated, "[i]f you want to contend you should not have paid it, and you paid by mistake, then the claim of the Fund is against employees, not the employer."

In any case, we need not decide whether under the Fund's Rules Malden employees were eligible for the June 1987 distribution. Even if they were ineligible, there is no basis upon which the Fund can argue that Malden should be liable for the Fund's "erroneous" payment of benefits to ineligible Malden employees. First, the Letter Agreement between Malden and the Union unambiguously defined the dispute as whether or not Malden owed an additional five months of contributions to the Fund for June 1987 benefits. The parties agreed "with respect *to such dispute*" that the Union would cause the Fund "to make such vacation pay benefits in 1987, *as hereinabove provided*, notwithstanding the pendency and outcome or resolution *of such dispute*." (Emphasis supplied). Furthermore, the parties agreed that "[e]ither the Employer, the Union or the ... Fund may initiate an arbitration proceeding or a court proceeding to resolve *the above dispute*." (Emphasis supplied). There is nothing in the plain language of the Letter Agreement that would support reading this Agreement—as the Fund urges—as embodying a promise by Malden to fully reimburse the Fund in the event that it is determined that Malden's employees were not eligible for benefits. The Letter Agreement neither mentions eligibility as an issue, nor does it discuss reimbursement. Moreover, the fact that the Letter Agreement inaccurately represented the Fund's position, as the Fund alleges, does not permit the Fund—after acting on the

agreement by paying the June 1987 benefits—to rewrite the agreement on its own terms.

Second, the Fund's own Basic Plan limits Malden's liability to contributions it owes to the Fund and prevents the Fund from claiming reimbursement from Malden based on eligibility. Specifically, Section 4(c) of the Basic Plan provides as follows:

No liability whatsoever shall attach to nor shall any claim be made against any employer ... by reason of any alleged obligation arising out of or in connection with the Fund, except that the respective employers shall be obligated to make contributions to the Fund as required by the provisions of the collective bargaining agreements entered into between such employers and the Union.

In this case, Malden agreed with the Union that the Fund would pay the June 1987 benefits and that Malden would make a maximum of five months of additional contributions should it be determined that Malden's 1986 contributions did not fully fund the June 1987 distribution. As the district court found—and we affirm—that Malden owed no additional contributions to the Fund, under the Fund's own rules it has no further claim against Malden based on the eligibility of the Malden employees or otherwise.

For the foregoing reasons we hold that Malden does not owe any additional contributions to the Fund nor is it required to reimburse the Fund for vacation benefits distributed to Malden employees in June 1987. In so holding we are mindful of the special protection accorded by ERISA to multiemployer employee benefit plans. We have held that "[r]epresentations made by a union official clearly contrary to the written fund rules cannot be binding on the Fund." *Cleary v. Graphic Communications Int'l Union Supplemental Retirement & Disability Fund*, 841 F.2d 444 (1st Cir.1988) (citations omitted). Similarly, the Second Circuit has stated that "[t]he actuarial soundness of pension funds is, absent extraordinary circumstances, too important to permit trustees to obligate the fund to pay pensions to persons not entitled to them under the express terms of the pension plan." *Chambless v. Masters, Mates & Pilots Pension Plan*, 772 F.2d 1032, 1041 (2d Cir.1985), *cert. denied*, 475 U.S. 1012, 106 S.Ct. 1189, 89 L.Ed.2d 304 (1986). We have also held, however, that refusing to refund excess contributions made by employers "could frustrate ERISA's goal of expanding pension plan coverage" and that "[m]anifest inequity is one way of discouraging employers from sponsoring ERISA-qualified plans at all." *Kwatcher*, 957 F.2d at 966. Our decision today is not inconsistent with these policies. Malden gave the Fund contributions solely for distribution to its employees in the form of vacation pay benefits. The Fund had sufficient contributions to cover the June 1987 benefit distribution. In holding that Malden does not have to reimburse the Fund for the distribution for which it already paid once, we avoid creating "manifest inequity" for Malden. At the same time we do not compromise the "actuarial soundness" of the Fund because "it is not entitled to [keep] funds to which it had no right in the first place." *Id.* at 967.

*Affirmed.*