January 6, 1993
United States Court of Appeals
For the First Circuit

No. 92-1081

IN RE: WPRV-TV, INC.,
Debtor,

PONCE FEDERAL BANK, F.S.B.,
Appellant.

No. 92-1229

IN THE MATTER OF: WPRV-TV, INC.,
Debtor,

PUERTO RICO FAMILY CHANNEL, INC.,
Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Gilberto Gierbolini, U.S. District Judge]

Before

Torruella, Circuit Judge,

Campbell, Senior Circuit Judge,

Stahl, Circuit Judge.

Charles A. Cuprill-Hernandez for appellant Ponce Federal Bank,

F.S.B.; Carlos A. Piovanetti Rivera for appellant Puerto Rico Family

Channel, Inc.

Orlando Fernandez, with whom Edgardo Munoz, John Garcia, and

Garcia & Fernandez, were on brief for trustee.

STAHL, Circuit Judge. In these consolidated

appeals, each appellant, Ponce Federal Bank, F.S.B. ("Ponce")

and Puerto Rico Family Channel, Inc. ("PRFC"), claims a legal

entitlement to purchase debtor in bankruptcy WPRV-TV, Inc.

("WPRV" or "debtor"). After much legal wrangling, the

district court1 denied both suitors. With the exception of

one issue, we affirm the district court's rulings.2

I.

PRIOR PROCEEDINGS

On December 3, 1987, WPRV, a television station

operating on channel 13 in Puerto Rico, filed a Chapter 11

voluntary petition for reorganization in the United States

Bankruptcy Court for the Eastern District of Oklahoma.3 On

April 4, 1988, Ponce filed a proof of claim for the principal

amount of $4,952,071. Ponce's claim was based on funds

1. During the course of the proceedings below, Bankruptcy
Court Judge Lamoutte, to whom this case was originally
assigned, recused himself. See infra p. 4. The district's

other bankruptcy judge was unavailable, and the case was
transferred to the district court.

2. We have previously held that when a district judge is
sitting in lieu of recused bankruptcy judges, he is thereby
exercising the district court's original jurisdiction over
bankruptcy cases, rather than sitting as a temporary member
of the bankruptcy court. An appeal, therefore, properly lies
with this court, pursuant to 28 U.S.C. 1291. In Re Plaza

De Diego Shopping Ctr., Inc., 911 F.2d 820, 824-25 (1st Cir.

1990) (citing In Re Manoa Finance Co., Inc., 781 F.2d 1370

(9th Cir. 1986), cert. denied, 479 U.S. 1064 (1987)).

3. According to scant references in the record, the Oklahoma
court was chosen for WPRV's bankruptcy proceedings because
its financial records were kept there.

-2-
2

advanced under five promissory notes which were guaranteed by

real estate and chattel mortgages on much of debtor's

estate.4 By June 1989, with prospects for reorganization at

a nadir, and pressure from creditors and lienholders

mounting, the Oklahoma bankruptcy judge, sua sponte,

converted the case to one under Chapter 7. The case was then

transferred to the District of Puerto Rico because the

majority of the assets relevant to the case were present

there. Contemporaneous with the transfer, Evangelina Vives

was appointed operating and liquidating trustee of debtor's

assets. Pursuant to 11 U.S.C. 721, Vives was given

authority to operate the station until July 31, 1989. This

authority was subsequently extended and continues through the

present time, although at this juncture it appears the

station is off the air. The trustee assumed the

administrative responsibilities of WPRV, maintaining it in

operation ostensibly to preserve its Federal Communications

Commission ("FCC") transmission license and thus its value as

a going concern.5

4. The parties dispute whether, and to what extent, Ponce's
claim is actually secured. As will be shown, infra, Part II.

B., we need not resolve that issue. Nor is it necessary for
us to address the district court's valuation of Ponce's
claim.

5. According to statements in the record, if the station had
remained off the air for a significant length of time, a
strong possibility existed that the FCC would revoke its
transmission license, resulting in a drop in the station's
value. As the record contains no dispute as to the accuracy

-3-
3

On August 8, 1991, the trustee filed an

"informative motion" reporting that all efforts to sell WPRV

through a direct, private sale had failed and that all

prospective offers had been withdrawn. Accordingly, she

indicated her intent to sell the station at public auction.

To that end, on September 10, 1991, the trustee filed a

notice of intent to sell WPRV as a going concern at an

auction to be held on September 30, 1991. The notice also

indicated that a hearing to confirm the auction sale would

occur on October 11, 1991.

Responding to the notice of the auction sale and

the accompanying bidding instructions, Ponce delivered its

sealed bid to the trustee, along with the required $150,000

deposit, on September 25, 1991, the deadline for such

submissions. The bid totalled $4.85 million, consisting of

Ponce's allegedly secured debt of $4.8 million, plus $50,000

cash. In addition to Ponce, two other bidders, neither of

whom had submitted a prior written bid or deposit--both of

which were required by the bidding instructions--appeared at

the September 30, 1991, auction and bid $1.095 million and

$4.055 million, respectively.

Despite the fact that Ponce was the apparent high

bidder, the trustee did not immediately recommend sale of the

of this scenario, we accept it without extensive explication
of federal communication law.

-4-
4

station to it. Rather, the trustee announced that she would

continue accepting offers until the date of the confirmation

hearing. On October 4, 1991, Ponce challenged her action by

filing a "Motion Requesting Order To Show Cause Why The

Option (sic) Held On September 30, 1991, Should Not Be

Adjudicated To Ponce Federal Bank And To Set Aside All Other

Bids Received Contrary To Bidding Instructions."

On October 11, 1991, Bankruptcy Judge Lamoutte,

prior to conducting the scheduled hearing and ruling on

Ponce's motion, recused himself based on information received

in a sealed motion filed by the trustee the previous day.6

6. The trustee's motion, simply captioned "Motion Under
Seal," was later unsealed by the district court. It was
accompanied by sworn statements from three men--Norman
Gonzalez Chacon, Federico Rivera Saez and Edwin Alfredo
Gonzalez Rivera--who were involved in PRFC's aborted attempt
to purchase WPRV with an auction bid of $6 million. The gist
of the statements was that prior to the auction, affiant
Gonzalez Chacon contacted Ponce to discuss the possibility of
Ponce financing a PRFC bid up to the amount of Ponce's debt
with WPRV. According to Gonzalez Chacon, a Ponce
representative dissuaded him from attending the auction,
ostensibly for the reason that his presence might
unintentionally force the bidding higher than necessary.
Gonzalez Chacon claims he was also assured that Ponce would
represent PRFC's interests at the auction. When all the bids
were lower than that contemplated by Gonzalez Chacon, he went
back to Ponce, feeling that PRFC's interests had not been
protected. Gonzalez Chacon reported that he was then told by
a Ponce representative that Ponce was not going to allow
anyone but itself to buy WPRV and "that if he were me, he
would not interfere in this matter because I would lose my
money, because the bank would challenge any award." He also
detailed threats against the professional reputation of the
trustee.
After unsealing the motion two months later, the
district court referred its contents to the United States
Attorney's office for investigation as to possible criminal

-5-
5

The case was then, as noted previously, transferred to the

district court, which eventually rescheduled the confirmation

hearing to November 12, 1991. Prior to that hearing,

however, on October 24, 1991, the trustee filed a motion for

authority to sell certain property of the estate free and

clear of liens, with the existing liens attaching immediately

to the proceeds of the sale in order to protect the equipment

and property interests of the lienholders. See 11 U.S.C.A.

363(f)(3), (5) (West 1979 & Supp. 1992). Simultaneously, the

trustee filed a notice of private sale, recommending a sale

to PRFC, whose representative, Gonzalez Chacon, had already

tendered a $100,000 earnest deposit towards the total

proposed sale price of $4.835 million.7 The notice of sale

itemized the total price into four categories: real property

($2 million); equipment subject to Ponce's liens ($280,500);

all other estate-owned equipment ($300,000); and going

concern value ($2.25 million).

misconduct.

7. According to the trustee, Gonzalez Chacon and Rivera Saez
originally expressed an interest in purchasing WPRV prior to
the auction, and were given the bidding instructions and a
sample Asset Purchase Agreement (APA). Following the
auction, which they did not attend, see supra note 6,

negotiations concerning a private sale to PRFC began,
culminating in the PRFC offer.

-6-
6

At the November 12, 1991, hearing, Ponce8 objected

to the PRFC sale for a number of reasons, including the fact

that it still believed that it was entitled to purchase the

station as a result of its--and no one else's--compliance

with the auction procedures. Ponce stated, however, that it

would not object to the PRFC sale provided that it was made

for all of the debtor's estate and not on an itemized basis.

Finally, Ponce stated that if the itemized sale were to

proceed, it would bid $2 million of its claimed secured debt

for the equipment subject to its lien which had been itemized

on the notice of private sale at a value of only $280,000. A

PRFC representative testified that if Ponce were allowed to

purchase the equipment at issue, which included transmission

towers vital to the station's operation, it would withdraw

its bid entirely. The trustee testified that the proposed

sale did not include all of the assets encumbered by Ponce

liens, and that a large part of the Ponce collateral was not

being sold. Finally, the trustee urged acceptance of the

PRFC bid because--by bringing in over four million dollars in

cash--the bid would realize the biggest benefit to the estate

and creditors as a whole. In contrast, the Ponce bid

included just over two thousand dollars in cash, with the

8. Only Ponce objected to the PRFC sale. Several creditors,
on the other hand, testified in the sale's favor.

-7-
7

rest represented by its credit claim, the actual value of

which the trustee disputed. See supra note 4.

Following the hearing, the district court orally

confirmed the sale to PRFC, overruled Ponce's objection to

same, and denied Ponce's show cause motion addressed to the

conduct of the auction. The judgment from which Ponce now

appeals was entered December 18, 1991. As relevant events

continued to occur after the confirmation, we defer

discussion of Ponce's appeal until a more complete background

picture has been sketched.

Shortly after the district court's approval of the

sale to PRFC, a multifaceted dispute developed between the

trustee and PRFC, grounded on disagreements as to the terms

of the sale, the trustee's inability to determine the

identity of PRFC's principals, and PRFC's apparent inability

to demonstrate satisfactorily its financial ability. Armed

with these concerns, and following several failed closing

attempts, the trustee notified PRFC'S attorney by letter

dated December 13, 1991, that she was cancelling the

negotiations and forfeiting PRFC'S $100,000 deposit.

Initially, both actions were purported to be taken pursuant

to provisions of the auction bidding instructions requiring

closing within thirty days of confirmation, which had taken

place November 12, 1991.

-8-
8

The trustee claimed that prior to the time that

PRFC made its purchase offer, the parties agreed that the

terms of the APA and auction bidding instructions would

control the sale. The parties had also agreed on certain

changes to be made in the APA relative to deposit, down

payment, and payment of operational expenses between the time

of closing and FCC license transfer. After the confirmation,

however, the trustee claimed that PRFC's attorney began

attacking previously agreed-upon APA provisions.

Also troubling the trustee was the controversy

concerning the identity of the parties with whom she was

dealing. According to the trustee, Gonzalez Chacon and

Rivera Saez indicated that PRFC had been incorporated, but

during negotiations, the trustee learned that it was not.

Moreover, while attorney Carlos Piovanetti apparently

represented PRFC, one partner, Rivera Saez, claimed that

Piovanetti did not represent him.

Finally, the trustee indicated that some of the

proof of Gonzalez Chacon's financial worthiness had come from

documents in the name of his son, Norman Gonzalez Rivera,

which Gonzalez Chacon had represented as his own.

On December 20, 1991, responding to the trustee's

actions, Gonzalez Chacon, on behalf of PRFC, filed a motion

seeking return of the deposit and an order directing the

-9-
9

trustee to negotiate with PRFC under court supervision.9

Evidentiary hearings were held on January 21 and 27, 1992,

following which the court entered an order vacating its prior

confirmation of the PRFC sale, upholding the trustee's

decision to forfeit the deposit, and allowing the trustee to

resume her efforts to sell the station. PRFC appeals from

that order.

9. In fact, the record indicates that the trustee tried to
negotiate with PRFC, even after the December 13, 1991,
cancellation. Again, however, no agreement was reached.

-10-
10

II.

DISCUSSION

A. PRFC Appeal

In setting aside the PRFC sale, the district court

endorsed the trustee's position, and found and ruled that

PRFC had accepted the APA and bidding instructions prior to

the trustee's recommendation of the sale, and had raised no

objections to their terms until after the sale's

confirmation. Thus, the court ruled, these terms became an

integral part of the sale agreement between PRFC and the

trustee, an agreement which led to the trustee's original

sale recommendation. Because the bidding instructions

required the purchaser to sign the APA within 30 days of

confirmation--an event, obviously, which did not occur--the

court held that the trustee's cancellation action was proper.

In addition, based on testimony presented at two hearings in

January 1992, the court ruled that the trustee's concerns

regarding possible misrepresentations on the part of PRFC as

to the actual identities of those who would be in control of

the station10 as well as their financial capacity11 were

10. As we have previously noted, the trustee became aware,
after the confirmation of the sale, that PRFC was not
incorporated, as she was led to believe it was. In fact,
incorporation did not occur until after she cancelled the
sale. As such, the purchase offer had been made by Gonzalez
Chacon and Rivera Saez as equal partners, rather than by the
corporation. Later, during the January hearings, it was

-11-
11

well-founded, and further militated in favor of vacating the

confirmation. With respect to the deposit forfeiture, the

court relied on a section of the bidding instructions which

mandated automatic forfeiture in the event of an

unconsummated sale. PRFC now claims that the district court

erred in approving the trustee's action in terminating the

sale and forfeiting the deposit.

As an initial matter, we note first the district

court's relatively narrow range of discretion in determining

to set aside its prior confirmation order. Matter of Chung

King, Inc., 753 F.2d 547, 549 (7th Cir. 1985). While the

court has broad initial discretion in granting or denying

confirmation, the court may vacate a prior order confirming a

revealed that Gonzalez Chacon was facing criminal charges in
Puerto Rico. And, while Gonzalez Chacon maintained that he
disassociated himself from PRFC, his signature appeared on
documents dated January 28, 1992, that were later submitted
to the court. The true identity and reputation of the buyer
was especially relevant, as the sale hinged on eventual
transfer of WPRV's license to the purchaser, and the FCC
considers such factors in its licensing decision. See 47

U.S.C.A. 307-311 (West 1991).

11. As a result of the concerns created by the previously
described discrepancy relating to the certificates of
deposit, the district court ordered PRFC to present evidence
of its finances at the second hearing, held on January 27,
1992. The only evidence presented was the testimony of Juan
Ramon Guzman, who characterized himself as a "contact" for
four alleged investors. Guzman, however, was unable to
provide any details as to the finances of PRFC, Gonzalez
Chacon, Rivera Saez, or any other investor. Instead, Guzman
could testify only as to what he was told by the investors--a
group of doctors--as to their interest and ability to
purchase WPRV.

-12-
12

sale only in very limited circumstances in the exercise of

its powers as a court of equity. Id. Following

confirmation, a court may set aside the sale if "there was

fraud, unfairness, or mistake in the conduct of the sale . .

. ." M.R.R. Traders, Inc. v. Cave Atlantique, Inc., 788 F.2d

816, 818 (1st Cir. 1986) (citation omitted); see also Chung

King, 753 F.2d at 549-550 ("the existence of fraud, mistake

or a like infirmity" would be necessary to vacate a confirmed

sale) (citing Bankruptcy Rule 9024, which applies Fed. R.

Civ. P. 60 to bankruptcy cases, allowing judgments to be set

aside for, inter alia, mistake, inadvertence, surprise,

excusable neglect, fraud, misrepresentation or any reason

justifying relief).

Such limited discretion is necessary, because

"`[i]f parties are to be encouraged to bid at judicial sales

there must be stability and a time must come when a fair bid

is accepted and the proceedings are ended.'" Id. (quoting In

re Webcor, 392 F.2d 893, 899 (7th Cir.), cert. denied, 393

U.S. 837 (1968)). "This policy of finality protects confirmed

sales unless compelling equities outweigh the interests in

finality." Id. (citations and internal quotes omitted); In re

F.A. Potts and Co., Inc., 86 B.R. 853 (Bankr. E.D. Pa.),

aff'd 93 B.R. 62 (E.D. Pa. 1988), and aff'd without opinion,

891 F.2d 280 (3rd Cir. 1989) (finding of fraud or mistake not

-13-
13

necessary when "compelling equities," including events

subsequent to confirmation, outweigh finality goal).12

We agree with the district court that the shifting

positions of PRFC with respect to its finances and the

identity of its principals constituted circumstances

sufficient to vacate the confirmation.13 As noted above,

it is the principle of finality which serves as the

counterweight to the court's discretion. Here, given the

uncertainty surrounding PRFC, that principle is outweighed by

countervailing equities. Nor would the bankruptcy court's

duty to preserve the value of the estate, see M.R.R. Traders,

Inc., 788 F.2d at 818, be fulfilled by a proposed sale to a

party apparently unable to meet future financial

obligations, and which might face additional obstacles in

obtaining approval of the license transfer from the FCC.

Thus, we conclude that the district court's decision to

12. A "grossly inadequate" sale price is also an acceptable
ground for vacating a sale, see Chung King, 753 F.2d at 550,

but such ground is not a factor in this case.

13. Although the district court described the conduct of
PRFC and its principals as fraudulent, we need not
necessarily ascribe evil intent to PRFC in order to affirm
the lower court's ruling. Instead, we rest our conclusion on
the "compelling equities" of the present situation. However,
as noted infra, the district court's partial reliance on the

thirty-day provision in the bidding instructions was
erroneous. Given the other circumstances surrounding PRFC,
this error does not affect our conclusion regarding the
decision to vacate confirmation.

-14-
14

vacate its confirmation of the PRFC sale was not an abuse of

discretion.

In challenging the court's forfeiture decision,

PRFC argues that the district court erred in finding that

PRFC accepted the terms of the APA and its incorporation of

both the bidding instructions and its forfeiture provision.

Our standard of review mandates that we accept the

district court's findings unless they are clearly erroneous.

Malden Mills Industries, Inc., v. Ronald Alman, 971 F.2d 768,

773 (1st Cir. 1992); In re Halmar Distributors, Inc., 968

F.2d 121, 129 (1st Cir. 1992). See also Fed. R. Civ. P.

52(a); Bankr. R. 8013. Findings are not clearly erroneous

unless "the reviewing court on the entire evidence is left

with the firm and definite conviction that a mistake has been

committed." Anderson v. City of Bessemer City, N.C., 470

U.S. 564, 573 (1985).

As noted above, only the bidding instructions

indicate that the deposit would be forfeited if the sale

failed to materialize. The APA, on the other hand, refers to

possible forfeiture only of a later down payment, equal to

ten percent of the purchase price, but is silent with respect

to forfeiture of the deposit at issue.

The district court, relying on the fact that PRFC

had possession of both the APA and bidding instructions prior

to the confirmation of the sale, ruled that both were a part

-15-
15

of the sale agreement. We disagree. While the exact date

that PRFC received the two documents is unclear, the trustee

acknowledges furnishing them to PRFC prior to the original

auction, a time frame not directly contradicted by PRFC.

This is consistent with the position taken by PRFC that it

was prepared to attend the auction but for the dissuasive

representations made by Ponce. See supra note 6. The trustee

further stated that she provided PRFC with another set of the

same documents following the auction in order to facilitate

negotiations, and that the parties agreed that all those

documents were part of the overall agreement to sell WPRV to

PRFC. With respect to the APA and notice of sale, which

ostensibly outlined the terms and contents of the private

sale, the record supports the trustee's assertion. The

bidding instructions, however, are another matter.

Simply put, there is nothing apparent from the face

of bidding instructions, nor anything else in the record,

from which one could conclude that the bidding instructions

are anything more than that--general instructions related to

bidding at the public auction. Many of the provisions

contained therein are irrelevant to a private sale, including

the timing and minimum amount of sealed bids. Several others

differ from the terms of the APA, including the amount of the

deposit and the time within which the buyer must apply for an

-16-
16

FCC license.14 Moreover, while the APA explicitly

indicates that the terms of the notice of private sale are to

become part of the APA, no similar mention is made of the

bidding instructions. Finally, we note that the only

evidence in the record of an agreement to incorporate is the

trustee's oft-repeated statement that "the parties agreed" to

incorporate the bidding instructions. Considering the above-

described deficiencies, however, the lack of details or other

evidence of such an incorporation agreement militates against

incorporation. In sum, the district court's finding that the

auction bidding instructions became part of the private sale

agreement does not comport with the language of the

instructions, the APA, or the circumstances surrounding a

private sale. Accordingly, we find that the district court's

decision to uphold the forfeiture of the $100,000 is clearly

erroneous and must be reversed.15 Thus, PRFC is entitled,

now that the proposed sale has been cancelled, to the return

of its deposit.

B. Ponce's Appeal

14. The bidding instructions call for a $150,000 deposit and
FCC filing within 30 days of confirmation. The APA reflects
a $100,000 deposit and mandates FCC filing within 15 days of
executing the APA.

15. Because we reverse the district court's forfeiture
decision based on the "incorporation" issue, we need not
address PRFC's argument that the trustee's Notice of Private
Sale was legally deficient.

-17-
17

We note at the outset that Ponce's objection to the

PRFC sale is now moot, as confirmation of the latter has been

vacated. Ponce's only other argument is that it should be

entitled to purchase WPRV because it was the successful

bidder at the auction. We need look no further than the

bidding instructions themselves to refute this claim. The

instructions clearly state that the "trustee reserves the

right to, in her sole discretion, . . . (c) reject any or all

bids." This statement plainly dovetails with the trustee's

statutory role as the sole representative of the estate. 11

U.S.C. 323. Here, where the Ponce bid would yield little

benefit to the estate and other creditors, the trustee was

well within her discretion in not recommending the Ponce bid

for confirmation, and the court correctly denied Ponce's

motion. See In re Gilbern Indus. Inc., 526 F.2d 627, 628

(1st Cir. 1975) ("It is hornbook law that if the highest bid

submitted at a judicial sale is manifestly inadequate, it

need not be accepted."). Ponce, meanwhile, has cited no

authority to the contrary.16 The cases upon which Ponce

relies vest some right in a potential purchase only after

confirmation, when, as we have previously discussed,

16. We note our displeasure with Ponce's decision instead to
devote a significant portion of its appellate brief to
hurling invectives at the trustee. The debtor in this case
has been in bankruptcy purgatory for over five years. Given
this unfortunate situation, Ponce's appellate style does
little to aid us in unsnarling this legal tangle.

-18-
18

discretion to vacate confirmation is narrowed. See, e.g.,

Chung King, Inc., 753 F.2d at 549; In re F.A. Potts, 86 B.R.

at 858. Accordingly, we find no error in the district

court's treatment of Ponce's objection.

III.

CONCLUSION

For the reasons stated herein, the judgments of the

district court are affirmed in part, and reversed in part.

Each side to bear its own costs. The papers in the case are

remitted to the district court for such actions as may be

required to implement the foregoing.

-19-
19